*In re* LOYD

Docket No. 74003. Argued November 13, 1985 (Calendar No. 12).— Decided March 21, 1986. Rehearing denied 425 Mich 1202.

The Judicial Tenure Commission filed a formal complaint in the Supreme Court against Lee Vera Loyd, Judge of the 68th District Court, alleging misappropriation of client funds, forgery of a former law associate's signature on trust account checks in conjunction with the misappropriation, obstruction of justice, violation of Canon 5(D) of the Code of Judicial Conduct, and subornation of perjury. Carolyn Stell, Judge of the Ingham Circuit Court, was appointed as master. Judge Loyd was suspended in the interim. Following hearings, the master filed findings of fact, and the commission, after reviewing the master's report and hearing oral argument, adopted the master's findings in toto and recommended that Judge Loyd be removed from office and permanently enjoined from serving in any future judicial capacity.

In an opinion by Justice CAVANAGH, joined by Chief Justice WILLIAMS and Justices LEVIN, BRICKLEY, BOYLE, and RILEY, the Supreme Court *held:*

Judge Lee Vera Loyd is removed from judicial office.

1. The master's grant, during hearings on the charges against the respondent, of the examiner's motion to amend the commission's complaint in conformance with the proofs to include charges of violation of Canon 5(D) of the Code of Judicial Conduct and subornation of perjury was proper and did not violate the respondent's due process rights. The respondent admitted that she was aware of the canon and that her conduct violated it. The subornation of perjury charge was integrally related to the misappropriation charge, and its addition did not surprise or prejudice the respondent. Moreover, even if the motion had not been granted, the remaining findings amply support the sanctions imposed.

2. The proper standard of proof in judicial tenure cases is

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] Am Jur 2d, Judges §§ 13 *et seq.*
See the annotations in the ALR3d/4th Quick Index under Judges.

preponderance of the evidence. The applicable court rule provides that judicial tenure hearings must conform as nearly as possible to the rules governing trial of civil actions in the circuit court. The primary concern in judicial tenure proceedings is the maintenance of high standards of judicial fitness and competency so as to preserve the confidence of the public. The master was aware of and applied the appropriate preponderance of the evidence standard. Her use of the phrase "beyond a reasonable doubt" in her findings was merely meant to emphasize the relative weight of the evidence against the respondent.

3. The findings of the master and the commission that the respondent misappropriated the funds in question, forged an associate's signature to facilitate the misappropriation, obstructed justice by dissuading others from initiating and later cooperating with the commission's investigation, violated Canon 5(D) by serving as conservator of the estate from which the funds were misappropriated, and suborned perjury by inducing certain witnesses to file false affidavits, are amply supported by the whole record.

Justice ARCHER took no part in the decision of this case.

1. JUDGES — JUDICIAL TENURE COMMISSION — STANDARD OF PROOF.

The standard of proof in judicial tenure cases is preponderance of the evidence; hearings in such cases must conform as nearly as possible to the rules of procedure and evidence governing trial of civil actions in the circuit court (MCR 9.211).

2. JUDGES — JUDICIAL TENURE COMMISSION — AMENDMENT OF COMPLAINTS.

A grant by a master in a judicial tenure hearing of a motion by an examiner to amend the complaint of the Judicial Tenure Commission to add additional charges against the respondent in conformance with the proofs was proper where one of the allegations was *integrally related* to certain of the initial charges, the respondent was aware of the conduct that was the basis of the other, and neither charge surprised or prejudiced the respondent nor violated her due process rights (GCR 1963, 118.3, 932.14; MCR 2.118[C], 9.214).

*C. Frederick Robinson* for the respondent.

*Joseph F. Regnier,* Executive Director and General Counsel, *Kenneth B. Morgan,* Co-Examiner, *Laurie L. Haroutunian,* and *Joan P. Vestrand* for the Michigan Judicial Tenure Commission.

CAVANAGH, J.

### INTRODUCTION

This case arises out of the Judicial Tenure Commission's filing of Formal Complaint No. 31 against 68th District Judge Lee Vera Loyd. The complaint, as amended, alleged the following misconduct:

1) Misappropriation of client funds.

2) Forgery of her former law associate's signature on trust account checks in conjunction with the misappropriation.

3) Obstruction of justice.

4) Violation of Canon 5(D) of the Code of Judicial Conduct.

5) Subornation of perjury.

We accept the master's findings of fact and the commission's findings as detailed herein, and hold that respondent is hereby removed from her judicial office.

### FACTS

Between May 1979 and May 1983, respondent practiced law in Flint in an association which included attorneys Arthalu Lancaster and Delores Coulter. The members of the association shared office expenses, but retained individual responsibility for their work. The association maintained three checking accounts: a general business account, a payroll account, and a client trust account. Any check needed two separate signatures to be negotiable.

In August 1981, Caroline Sullivan and Earnestine Buchanan hired respondent to handle a personal injury claim. The case involved injuries sustained by their children in a motorcycle-pedestrian

accident. Respondent negotiated a partial settlement against the motorcyclist for $40,000. Respondent deducted her fee and deposited the remainder (the "Sullivan funds") into the association's client trust account. Respondent was later appointed conservator of these funds by order of the probate court.

In May 1983, respondent was appointed to the 68th District Court. Both respondent and Lancaster had actively sought the appointment.

Before assuming the bench, respondent transferred several cases, including the Sullivan case, to Flint attorney Gregory Gibbs. Gibbs would later testify that he was under the impression that respondent placed all of the Sullivan funds in trust.

In July and August 1983, Caroline Sullivan and her daughter met with Gibbs to discuss the status of their case.[1] When asked about the Sullivan funds, Gibbs told his clients that the money was being held in trust by respondent.

In December 1983, respondent's secretary called Lancaster's office. Respondent requested that Lancaster write a check out of the Sullivan funds, so that respondent could continue her bond as conservator in the Sullivan case. This proved to be the impetus of these proceedings.

Lancaster, who was under the impression that the entire Sullivan matter had been transferred out of the office, contacted Gibbs. Gibbs wrote respondent, asking why the funds were not in an interest-bearing account. Lancaster and Coulter also wrote respondent and asked her to explain why $10,500 was missing from the trust account.

During the commission's investigation, it became apparent that a crucial factual issue involved

---

[1] A negligence claim was still pending against the City of Flint.

whether respondent's former clients gave her prior permission to use the Sullivan funds. The commission tape-recorded an interview with Earnestine Buchanan. During that interview, Ms. Buchanan stated that she was positive that she never gave respondent prior permission to use the funds. When Buchanan testified to the contrary at the hearing, the tape-recorded statement was used, over objection, for impeachment purposes.

As a result of the commission's investigation, respondent ultimately admitted that she withdrew ten checks totaling $10,500 from the Sullivan funds for her personal use. These withdrawals occurred both before and after respondent's judicial appointment. The focus of this proceeding involves respondent's personal use of these funds.

On April 10, 1984, the commission filed its formal complaint with this Court, and we appointed 30th Circuit Court Judge Carolyn Stell as master. The master granted a motion to amend the complaint to allege obstruction of justice. We granted the commission's supplemental petition for interim suspension.

The hearing before the master included the testimony of twenty-five witnesses and the introduction of fifty-four exhibits into evidence and was concluded by the filing of a thirty-page report.

The commission reviewed the master's report and heard oral argument before rendering its decision. The commission adopted the master's findings in toto, and recommended to this Court that respondent be removed from office and permanently enjoined from serving in any future judicial capacity.

PRELIMINARY ISSUES

Respondent raises two procedural arguments before addressing the factual issues.

At the close of proofs, the examiner moved to amend the complaint to conform to the proofs. The examiner sought to add, inter alia, charges involving a violation of Canon 5(D) of the Code of Judicial Conduct and subornation of perjury. Respondent's counsel objected on the basis that respondent had no notice of the additional charges and had not come to the hearing prepared to defend against them. See *In re Ruffalo,* 390 US 544; 88 S Ct 1222; 20 L Ed 2d 117 (1968); *State Bar Grievance Administrator v Jackson,* 390 Mich 147, 155; 211 NW2d 38 (1973). At the suggestion of respondent's counsel, the master took the motion to amend the complaint under advisement. In her written report, the master granted the motion in part, stating that, in light of the lack of objection during the pertinent testimony, the issues of a violation of Canon 5(D) and subornation of perjury had been tried with respondent's implied consent. See GCR 1963, 932.14; MCR 9.214; GCR 1963, 118.3; MCR 2.118(C).

Before reaching its decision, the commission requested further briefing from the parties on this issue. The commission found that the master properly granted the motion to amend the complaint.[2]

---

[2] The commission's decision states:

"MCR 9.214 (formerly GCR 1963, 932.14) provides:

" 'The Master before the conclusion of the hearing, or the commission, before its determination, may allow or require amendments to the complaint or answer. The complaint may be amended to conform to the proofs or to set forth additional facts, whether occurring before or after the commencement of the hearing. If an amendment is made, the respondent must be given reasonable time to answer the amendment and to prepare and present his or her defense against the matters charged in the amendment.'

"With all due respect to the Respondent's argument that the Master's ruling was improper, the Commission finds upon the record sufficient proof that the charges in the Examiner's proposed amendments were fully tried with her implied consent, and that Respondent knowingly waived any opportunity to present additional proofs as to

We have distinguished *Ruffalo* in a situation where an attorney was effectively informed of the charge, and was in no way prejudiced from adequately defending himself. *State Bar Grievance Administrator v Roth*, 400 Mich 484, 492; 255 NW2d 624 (1977).

We have also declined to apply *Ruffalo* in at least one judicial tenure case. *In re Ryman*, 394 Mich 637; 232 NW2d 178 (1975). In *Ryman*, the commission alleged that a district judge was unfit to hold office because of acts committed both before and after he assumed the bench. Ryman was not formally charged with perjury or false swearing. Nonetheless, the master and the commission both found that respondent gave false testimony. The majority of the Court[3] quoted the commission's decision on this allegation verbatim and ordered removal. 394 Mich 643.

Accordingly, we find that the motion to amend the complaint was properly granted on the basis of GCR 1963, 932.14 and GCR 1963, 118.3. Respondent admitted that she was aware of Canon 5(D) and knew that her continued role as conservator violated that canon. No objection was made during that testimony.

We also agree with the commission that the subornation of perjury charge was integrally related to the misappropriation charge. Respondent was not surprised or prejudiced in this matter. At the time of the supplemental petition for interim suspension, respondent was well aware of the conflicting affidavits on the issue of permission and the probability that they would be the subject of

these matters. Further, the proofs regarding her claim of prior permission are essentially identical to those regarding the allegation of subornation of perjury; the outcome of these two mutually exclusive claims being dependent upon the same proofs. In short, she could not have been surprised by the proposed amendments."

[3] Justice LEVIN applied *Ruffalo, supra,* in the dissenting opinion.

further inquiry. Furthermore, respondent made no motion to reopen the proofs, even though the possibility was discussed during the hearing. Therefore, the unique facts of this case indicate that respondent's due process rights were not violated.

We stress that even *if* the motion to amend had not been granted, the remaining charges and findings amply support the sanctions imposed today.

The second preliminary problem involves the appropriate standard of proof. It is clear that our review of the record, including the master's report, is de novo. MCR 9.225; *In re Lawrence,* 417 Mich 248, 252; 335 NW2d 564 (1983). However, the question what standard of proof is required at the hearing is not as clear.

Respondent argues that the allegations must be proven by clear and convincing evidence. *In re Heuermann,* 90 SD 312; 240 NW2d 603 (1976). During oral argument, respondent's counsel noted that the commission's brief in *In re Del Rio,* 400 Mich 665; 256 NW2d 727 (1977), advanced a similar standard. Nevertheless, throughout *this* proceeding, the commission consistently argued that it had the burden of proving the allegations contained in the complaint by a preponderance of the evidence. We agree.

MCR 9.211 states that the hearing "must conform as nearly as possible to the rules of procedure and evidence governing the trial of civil actions in the circuit court." The preponderance of the evidence standard is generally employed in civil actions. 30 Am Jur 2d, Evidence, § 1163, p 337. We also emphasize that the primary concern in judicial tenure proceedings is the maintenance of high standards of judicial fitness and competency. The need for a reputable judiciary and the maintenance of the public's confidence in a compe-

tent judiciary is of utmost importance. See *In re Probert,* 411 Mich 210, 228; 308 NW2d 773 (1981). For these reasons, we are not persuaded that a standard of "clear and convincing" evidence is appropriate. Accordingly, we hold that the proper standard of proof to be utilized in judicial tenure cases is preponderance of the evidence.

## SUBSTANTIVE ISSUES

### MISAPPROPRIATION

Respondent admitted in her amended answer that she withdrew $10,500 from the Sullivan funds. Although respondent admitted that she never received prior *written* consent from the parties to use these funds, her basic defense is that she had the clients' prior oral permission to borrow the money. The master focused on the testimony of Reverend Willie Buchanan, Caroline Sullivan, and Earnestine Buchanan.

Although Reverend Buchanan testified that he gave respondent permission to "handle the whole trust fund in the manner that she saw fit," the master correctly noted that Reverend Buchanan was merely a family advisor and was neither a party to the Sullivan case nor legal guardian or next friend of any of the parties in that case. Although Reverend Buchanan was initially unsure of the exact year and month, he ultimately stated on direct examination that he gave verbal permission to use the funds in October 1982. The master noted a number of inconsistencies in Reverend Buchanan's testimony before concluding:

It is the Master's finding, based upon her opportunity to view the demeanor of the witness, his attitude, and the substance of his testimony, that the testimony of Reverend Buchanan was clearly

fabricated in an attempt to help Respondent for whom he testified. "The only thing she has ever been to our family is help for our family, provided help in every way she could." And for whom he signed an affidavit presented to him by Respondent without reading it because ". . . I know it was legal . . . because, like I said, I never knowed [*sic*] Judge Loyd to do anything crooked because, like I said, she always [*sic*] been fair." His loyalty is admirable; his willingness to perjure himself is not.

Caroline Sullivan's testimony regarding permission to use the funds was riddled with inconsistencies. She recalled a meeting with attorney Gibbs in his office in which she told Gibbs that she was angry with respondent for taking the money and that she wanted to sue her. At one point, she stated unequivocally that she gave respondent permission to use the funds in April 1984. She also stated that she gave respondent verbal permission to use the funds in April or March 1982. This date would have been before the partial settlement occurred and must be compared with her affidavit which states that she gave oral permission in the fall of 1982.

The master concluded:

It is the Master's finding that such permission was not given prior to the funds being borrowed from the Client Trust Account, but was given after the money was repaid and Sullivan realized that her earlier actions had caused trouble for Respondent. This finding is based upon the witness' demeanor and attitude. I believe that Sullivan was not consciously perjuring herself, but had been persuaded by Respondent that she herself had erred in failing to "remember" her previous permission.

Earnestine Buchanan testified that she gave

respondent prior permission to use the funds. However, the credibility of this testimony was seriously undermined by her previous tape-recorded statement. We agree with the master's finding that this witness' testimony was obviously "coached."[4]

The master made the following ultimate findings regarding the misappropriation charge:

> (1) That both prior to and after her appointment to the 68th District Court the Respondent misappropriated from the estates of Angela Sullivan, Brian Sullivan and James Liggins $10,500 derived from the partial settlement of the *Sullivan* matter.

> (2) That Respondent had no permission whatsoever prior to March 20, 1984 from Caroline Sullivan, Angela Sullivan, Earnestine Buchanan or Reverend Willie Buchanan to use these funds.

> These findings are not only established by a preponderance of the evidence, but beyond a reasonable doubt.

Our review of the record persuades us that the

---

[4] "Ms. Buchanan evidenced great difficulty in comprehending the questions put to her during the hearing, but she clearly understood that she had one answer to give—'they scared me.' She used this phrase no fewer than 14 times. She had obviously been coached to give this answer in an effort to explain her prior inconsistent statement made to the Commission investigators (Commission Exhibit 64). The coaching was particularly evident when she gave the same answer to questions that had nothing to do with the obtaining of the previous statement, *e.g.,* in response to a question asked to establish her appearance in Probate Court. Ms. Buchanan had great difficulty in keeping her story straight. At one point she testified that she told the truth in the taped statement; at a later point she testified that she denied giving Respondent permission to use the money during the taped statement because 'they scared me.'

"As was the case with Sullivan, Ms. Buchanan's greatest desire was to see that no harm came to Respondent. She testified that 'I don't want to hurt her no kind of way.'

"It is the finding of the Master that Ms. Buchanan did not give permission for Respondent to borrow the money in the Client Trust Account before 1984. This finding is based upon the witness' demeanor and testimony."

findings of the master and the commission are amply supported. We decline to further discuss the "beyond a reasonable doubt" standard, since that standard is not required under today's holding. It is obvious that the master was well aware of the appropriate standard since she ruled on it in her report. We believe that the use of the "beyond a reasonable doubt" language was merely meant to emphasize the relative weight of the evidence against the respondent.

## FORGERY

The complaint alleged that respondent forged Lancaster's signature to facilitate the misappropriation of the Sullivan funds. Respondent admitted signing Lancaster's name on at least nine trust account checks. She contends that she had Lancaster's implied consent to do so.

Both Lancaster and respondent testified that they had, on occasion, signed each other's names on checks drawn from the general account. Lancaster stated that this implied understanding did not carry over to the trust account because "[t]hey weren't our monies." Ms. Coulter stated that she was unaware of any common practice regarding the trust account. Respondent testified that she assumed there was an informal understanding "based on the fact that Miss Lancaster would sign my name to checks and other documents and I did the same thing with her name." Respondent testified:

> *Q.* And was this common practice known to all parties?
> *A.* Yes.
> *Q.* And was it common practice known to all parties as it related to the trust account also?

*A.* I assumed it was. We certainly never had a discussion about you do it with this account but not with that one.

*Q.* Did you at any time forge the name of Arthalu Lancaster on any document or check?

*A.* No.

The master noted that respondent was the only one who testified that signing another attorney's name to a trust account check was a common practice.

Forgery may be defined as the making of a false document, including a check, with the intent to deceive in a manner which exposes another to loss. MCL 750.248; MSA 28.445; *People v Susalla,* 392 Mich 387, 392-393; 220 NW2d 405 (1974). Respondent argues that she had no intent to deceive on the basis of her assertion that she had Lancaster's implied consent to sign both signatures to the trust account checks.

The master found

that the testimony demonstrates that Respondent did not have express or implied authority from Lancaster to sign Lancaster's name to any of the nine checks drawn upon the Client Trust Account. The Master further finds that the method used to account for these checks clearly demonstrates an intent to hide the fact that Respondent was withdrawing client funds for her own personal use.

The Master makes the following findings of fact with respect to this charge:

(1) That Respondent forged Arthalu Lancaster's signature to the checks enumerated in paragraph 4 of Formal Complaint No. 31, except Check No. 143 dated May 2, 1983, in the amount of $300.

(2) That Respondent had no authority to place Lancaster's signature upon such checks.

(3) That Respondent took such action in further-

ance of her intentional plan to misappropriate client funds from the *Sullivan* settlement proceeds.

These findings are established by a preponderance of the evidence.

We agree that respondent's actions involving the trust fund and the signing of the trust checks demonstrates an intent to deceive. Respondent wrote six checks totaling $8,550 from the Sullivan funds between October 1982 and May 1983. However, she never entered these transactions onto the trust account ledger. Respondent also failed to include the disbursements in the annual account filed with the probate court. Respondent made notations on five of these checks that the funds taken represented salary advances to her for work to be done in unrelated collection cases. Respondent admitted that these notations were untrue. When respondent transferred the Sullivan case to Gibbs, she failed to mention that she had written these checks with her clients' permission. The testimony given by respondent's former associates, coupled with the surreptitious accounting methods used, supports the master's finding.

## OBSTRUCTION OF JUSTICE

Paragraph 13 of the complaint alleged that respondent engaged in various activities designed to dissuade others from initiating, and later cooperating with the commission's investigation.

In *People v Ormsby,* 310 Mich 291, 299-300; 17 NW2d 187 (1945), we said:

The term, to obstruct justice, connotes an interference with the orderly administration of law. In 46 CJ p 868, it is stated: "The phrase 'obstructing justice' means impeding or obstructing those who seek justice in a court, or those who have duties or

powers of administering justice therein." [Citations omitted.] In 2 Gillespie, Michigan Criminal Law and Procedure, p 1879, § 1637, it is stated:

"The question upon the trial is not the guilt or innocence of the respondent in the main case, nor the sufficiency of the information nor the jurisdiction of the court, but whether the respondent was guilty of obstructing or interfering with the administration of justice."

*The more common examples of obstruction of justice are* the bribery and influencing of officials and officers intrusted with the enforcement of law, *coercion of witnesses, interference with the obtaining of testimony,* resisting an officer, *and other acts generally calculated to interfere with the orderly process of the administration of law.* [Emphasis supplied.]

See also *People v Coleman,* 350 Mich 268; 86 NW2d 281 (1957); *People v Somma,* 123 Mich App 658, 661-662; 333 NW2d 117 (1983).

Paragraphs 13(a) and 13(b) alleged that respondent made various threats against her former law associates in an attempt to harass and dissuade them from initiating and cooperating with the commission's investigation.[5]

[5] The amended complaint alleged:

"(13) That Respondent has obstructed justice by threatening and attempting to intimidate certain individuals, who possess knowledge of the misconduct described above and who will be witnesses at the formal hearings, through, but not limited to, the following acts:

"(a) On or about January 3, 1984, Respondent made certain false allegations of wrongdoing directed toward Ms. Arthalu Lancaster, in a letter to Ms. Lancaster and Ms. Delores Coulter. The clear intent of such conduct was to dissuade Ms. Lancaster and Ms. Coulter from filing a request for investigation with the Commission regarding the misconduct described in paragraphs one (1) through (12) above, and to harass such individuals.

"(b) During the period from January 24, 1984, through April 6, 1984, Respondent repeatedly and persistently phoned the home and office of Ms. Lancaster and during the ensuing conversations directed threats toward Ms. Lancaster. The clear intent of such conduct was to dissuade Ms. Lancaster from cooperating with the Commission's investigation into the misconduct described in paragraphs one (1) through twelve (12) above, and to harass Ms. Lancaster."

Before contacting the commission, Lancaster and Coulter wrote respondent and inquired into the whereabouts of the missing Sullivan funds. The letter requested an explanation and stated that "[a]ll of those monies were removed without either our knowledge or consent."

Respondent admitted replying in a letter dated January 3, 1984. Respondent asserts that the letter was 1) meant to protect her former clients from Lancaster, 2) reflected justifiable anger towards Coulter for allowing herself to become embroiled in a controversy which she knew nothing about, and 3) contained truths about Lancaster's conduct which would be established at the hearing. With respect to the telephone calls, respondent denied any intent to threaten Lancaster.

The master summarized numerous conversations between Coulter, Lancaster, and respondent. We do not need to chronicle each and every allegation contained in paragraph 13. We are convinced that the following specific examples established the charge of obstruction of justice by a preponderance of the evidence.

Both Lancaster and Coulter testified that respondent implied that she would not be the only one subject to disciplinary proceedings. Lancaster testified as follows:

> *Q.* In the course of these discussions, was there any reference to Judge Loyd going down?
> *A.* Yes, and I don't know if those were between the 14th, 15th, whatever it was, and the time we wrote the letter or after the letter that she wrote to me. It seems that it was before we wrote the letter, but I know that she said repeatedly in several conversations, and whether they were at that point or later in January, I won't go down alone.

Although respondent denied using such language, Coulter substantiated this testimony.

Lancaster also testified in support of the allegation contained in paragraph 13(f), that the following threat was made during a telephone call received near midnight on April 9, 1984:

> *Q.* What happened?
> *A.* I walked in the house and the telephone rang and I picked it up and Lee identified herself.
> *Q.* What did she say?
> *A.* She said, "Artie, this is Lee," and then she said something and I don't remember what it was but it was a lot of this same type of, you know, why are you doing this or remarks like that, because I remember my response was, I said, "Lee, what do you want me to say?"
> *Q.* What did she say?
> *A.* She said, "I don't want you to say anything. I just want you to listen." And then she said, "I'll follow you to the ends of the earth, I'll follow you until the day I die," and then she said, "I'll stop at nothing. Do you know what nothing means?" And that's all she said.
> *Q.* Did you make a response?
> *A.* I said, "Lee, I am going to hang up."
> *Q.* And you terminated the call?
> *A.* Yes.

We agree with the master that these statements were made with the clear intent to dissuade Lancaster and Coulter from initiating and later cooperating with the commission's investigation. Respondent argues that no recordings were made of these statements even though Lancaster testified that she recorded other conversations. We find this argument irrelevant. The animosity which existed between Lancaster and respondent, and the truth or falsity of the allegations directed against Lancaster are not the focus of these proceedings. Such

evidence did not prevent the master from correctly finding that the allegations of obstruction of justice were proven by a preponderance of the evidence.

Paragraph 13 also summarized three telephone calls between respondent and Gibbs which occurred after Ms. Buchanan gave her tape-recorded statement. In the first call, respondent expressed her displeasure with Gibbs for his failure to inform her of the meeting in which Buchanan gave the recorded testimony. In the second call, respondent accused Gibbs of failing to protect his clients' interests during that meeting. In a third call, which occurred after respondent's appointment, respondent demanded that Gibbs return all of "her" files. Gibbs testified that he did not return the files, since none of his clients had contacted him regarding a substitution of counsel. He also stated that he would have incurred economic loss as a result of such action.

The master found that the allegations contained in paragraphs (13)(d) and (e) were established by a preponderance of the evidence.[6] We have reviewed the record and agree with the master's finding.

## VIOLATION OF CANON 5(D)

Amended paragraph 15 alleged that respondent's failure to withdraw as conservator for the

---

[6] "The telephone calls made to Gibbs by Respondent after the March 9, 1984 and March 20, 1984 meetings at Gibbs' office, if considered individually, might be interpreted as merely expressions of disappointment at perceived disloyalty of a friend or as gratuitous comments with respect to an attorney's failure to protect his clients. However, the telephone call made April 5, 1984 by Respondent to Gibbs, in which she demanded the return of files she had turned over to him when she took the bench, cannot be construed as other than an attempt to harass Gibbs and dissuade him from testifying. Thus when one views all of the telephone calls as a whole, the pattern emerges of a steadily escalating effort to interfere with the obtaining of testimony from Gibbs."

estates of the children involved in the accident violated Canon 5(D) which states:

> A judge should not serve as the executor, administrator, testamentary trustee, or guardian, except for the estate, testamentary trust, or person of a member of his immediate family, and then only if such service will not interfere with the proper performance of his judicial duties.

The master found that this charge was established by the respondent's own admission, since she testified that she was aware that she was in violation of the canon in December 1983, but did not take any steps to withdraw as conservator. We agree that this allegation was established by a preponderance of the evidence.[7]

---

[7] The following excerpts from respondent's testimony establish a violation of Canon 5(D):

"*Q.* You were a judge and in office at that time, were you not?

"*A.* That's right.

"*Q.* Had you received notice from the Probate Court that your bond required renewal?

"*A.* I think I had, um-hum.

"*Q.* Had you received notice that your account as fiduciary was required?

"*A.* I don't remember, but I know I received notice on that.

"*Q.* At that time, Judge, were you aware of Canon 5 of the Code of Judicial Conduct?

"*A.* Yes.

"*Q.* You were?

"*A.* Yes.

"*Q.* And what section of that Canon does that refer to?

"*A.* Could I see?

"*Q.* Yes.

"*A.* I was aware of that, Mr. Regnier.

"*Q.* Does not Canon 5(D) indicate that a judge should not serve as executor, administrator, testamentary trustee or guardian, except for the estate, testamentary trust or person of a member of his immediate family?

"*A.* Yes, sir, it does.

"*Q.* Were you aware that you were in violation of that Canon at that time?

"*A.* Yes, I was aware of that.

\* \* \*

## SUBORNATION OF PERJURY

Paragraph 16 of the amended complaint alleged that respondent violated DR 1-102(A)(3)-(6)[8] by inducing Caroline Sullivan, Earnestine Buchanan, and Reverend Buchanan to file false affidavits with this Court. The affidavits were filed in support of respondent's motion to reject the commission's petition for interim suspension. In general, the affidavits indicated that Ms. Sullivan and Ms. Buchanan gave permission to respondent in the fall of 1982 to use a portion of the Sullivan funds for her personal use.

On the basis of the earlier finding that respondent did not have prior permission to use the funds, the master concluded that the allegations contained in paragraph 16 were established beyond a reasonable doubt:

> The testimony is clear that Respondent prepared the affidavits and requested affiants' signatures. The content of the affidavits has already been found to be false. (See analysis of affiants' testi-

---

"*Q.* She indicated that you'd have to file papers?

"*A.* Yeah, I would have to prepare them myself. Frankly at that point I didn't want to do it and she suggested that it could be ordered by the court if someone else did it. I don't remember the procedure, but I know that it was done as an accomodation [*sic*] so that I wouldn't have to do it.

"*Q.* What didn't you want to do, Judge?

"*A.* I didn't want to have to go through at the time steps of looking through the Probate to do whatever I had to do to get out of it. I didn't want to refresh myself with Probate enough to do it."

[8] The rule states in part:

"(A) A lawyer shall not:

*   *   *

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law." See also MCR 9.205(E).

mony under Section I, *supra.*) Note also Sullivan's telling comment that the affidavits were signed "in order to make things halfway legal, I guess."

The facts, as found by the Master, are strikingly similar to those which were found to provide an adequate basis for a finding of subornation of perjury in an attorney misconduct case, *In the Matter of Grimes,* 414 Mich 483, 493 [326 NW2d 380] (1982). The standard of conduct for judges is surely no less than that expected of attorneys.

Respondent argues that there was no testimony that she actually prepared the affidavits. We find that a reasonable reading of the testimony supports at least an inference that she prepared them or directed their preparation.[9] Furthermore, regardless of who *prepared* the affidavits, it is clear

[9] "*The Court:* Please continue, Mr. Morgan.

"*Q. (Mr. Morgan)* Reverend Buchanan, you testified already that there was no agreement regarding interest in the repayment of the fees from Judge Loyd. I hand you Commission's Exhibit 60, again your affidavit dated April 20th, and doesn't that say that the agreement was that the fund would be repaid with interest?

"*A.* Yes.

"*Q.* But you didn't draft this document?

"*A.* We didn't ask her for interest. She agreed to pay it back with interest, but we didn't ask her.

"*Q.* Do you recall whether your sister, Earnestine, ever executed an affidavit for filing with the Michigan Supreme Court regarding this matter?

"*A.* Yes, she signed that same day.

"*Q.* The same day?

"*A.* Same day I did.

"*Q.* Was she in your home signing at the same time you signed yours?

"*A.* Yes, she was.

"*Q.* She was. So she was an additional person that was at your home at that time?

"*A.* Right. Matter of fact came back to my memory, Judge Loyd went over the affidavits with us and also Caroline Sullivan.

"*Q.* Came back to your memory?

"*A.* Me and Judge Loyd, the secretary went out to Caroline Sullivan's home and she went over the affidavits with us.

"*Q.* Did you just remember this during the break?

"*A.* Yes, I did."

that respondent requested that the affiants sign them:

> *Q.* Let me show you this paper entitled Affidavit of Caroline Sullivan, is that your signature?
>
> *A.* Yes.
>
> *Q.* Dated the 20th of April, 1984?
>
> *A.* Yes.
>
> *Q.* Do you remember who asked you to sign this affidavit?
>
> *A.* Lee.
>
> *Q.* Lee? Do you remember where you signed it?
>
> *A.* In her office, I guess.
>
> *Q.* In her office at Court?
>
> *A.* (Nodding head yes.)
>
> \* \* \*
>
> *Q.* Who asked you to sign those statements?
>
> *A.* It depends on which statements you're talking about.
>
> *Q.* The affidavits I showed you?
>
> *A.* In order to make things halfway legal, I guess, when did Lee did [*sic*].

Respondent argues that all the affiants swore to the truth of the affidavits on the witness stand. Nonetheless, the master found the contents of the affidavits to be false on the basis of her earlier finding regarding the misappropriation charge.

Allegations of perjury and subornation of perjury generally hinge on the relative credibility of witnesses. Indeed, the master explained at length that her findings were partly based on her perception of the witnesses. Our power of review de novo does not prevent us from according proper deference to the master's ability to observe the witnesses' demeanor and comment on their credibility. Cf. *In re Laster,* 404 Mich 449, 471; 274 NW2d 742 (1979) (dissent of LEVIN, J.). Our review per-

suades us that the master's findings are amply supported by the whole record.

The commission recommends that we permanently enjoin respondent from serving in any future office. We recently rejected a similar recommendation under different facts. *In re Callanan,* 419 Mich 376, 387-389; 355 NW2d 69 (1984).

We hold that respondent shall be removed from office. Const 1963, art 6, § 30. Pursuant to MCR 7.317(C)(3), the clerk is directed to issue the order of removal forthwith.

Wɪʟʟɪᴀᴍs, C.J., and Lᴇᴠɪɴ, Bʀɪᴄᴋʟᴇʏ, Bᴏʏʟᴇ, and Rɪʟᴇʏ, JJ., concurred with Cᴀᴠᴀɴᴀɢʜ, J.

Aʀᴄʜᴇʀ, J., took no part in the decision of this case.