*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SLA,

              Petitioner-Appellee,

v

SZ,

              Respondent-Appellant.

UNPUBLISHED
June 4, 2020

No. 349341
Gladwin Circuit Court
LC No. 19-010012-PH

JCA,

              Petitioner-Appellee,

v

SZ,

              Respondent-Appellant.

No. 349342
Gladwin Circuit Court
LC No. 19-010013-PH

Before: RONAYNE KRAUSE, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

In this consolidated appeal, respondent SZ appeals by right the trial court's orders refusing to terminate the personal protection orders (PPOs) previously granted at the request of two of SZ's neighbors, SLA and JCA. At respondent's invitation, and in order to achieve meaningful understanding of the disputes underlying this matter, we have taken judicial notice of certain other litigation involving SZ and her neighbors, as well as this Court's records of a prior appeal in some of that litigation. The trial court, after a lengthy hearing during which it displayed commendable patience with all of the parties, found that respondent had engaged in a pattern of deliberately threatening conduct toward petitioners and that respondent's explanations for her conduct were not credible. It therefore ordered that the PPOs would remain in effect. We agree, and we affirm. This appeal is being decided without oral argument pursuant to MCR 7.214(E)(1).

## I. BACKGROUND

Petitioners are husband and wife, and they and respondent are rural neighbors. At the time of the hearing, petitioners were 71 and 72 years old, and they had lived at their residence for 42 years. Respondent and her mother purchased their property in 2015. The parties' properties do not directly abut, but the southwest corner of petitioners' property and the northeast corner of respondent's property are approximately 100 feet apart and across a shared road. In a previous appeal, we set forth some of the backdrop to the instant matter. See *Zlatkin v Roggow*, unpublished per curiam opinion of the Court of Appeals, Docket No. 346247, issued March 19, 2020. We will not repeat our prior opinion in detail. In a nutshell, after respondent and her mother bought their property, they found themselves at odds with their neighbors in the small community due to their animals frequently escaping, followed by respondent contending that the neighbors were sabotaging her fences and waging a campaign of intimidation to force her to move away. A civil jury found respondent less credible than the neighbors regarding respondent's claims that the neighbors, including petitioner JCA, maliciously damaged her fence and stalked her; and regarding the neighbors' nuisance counterclaim. While that litigation was pending, petitioners filed the petitions in the instant matter.

Petitioners' petitions are not completely identical. However, both enumerated instances of respondent driving in a dangerous manner and pursuing petitioners, cutting them off, or potentially crashing into or running them over, both in her car and on her tractor. Petitioners also described harassment in the form of respondent videotaping them, photographing them, parking in front of their house and watching them, and raising her voice at them. The trial court initially granted petitioners' requested PPOs *ex parte* on the basis of the allegations of vehicular assault. Respondent refused service of the PPOs but nevertheless promptly filed motions seeking to terminate the PPOs, claiming to have a variety of documentation or other records that would disprove the truth of petitioners' allegations. The trial court held a hearing, at which respondent was represented by counsel and petitioners appeared *in propria persona*.

Petitioners testified that they had been terrified by the vehicular incidents, and that respondent essentially stalked and harassed them constantly with her unremitting video recordings and photography. They described the various incidents in detail, with some references to the prior *Zlatkin* appeal noted above. They explained that respondent's harassment had been going on for years, but they finally decided it needed to end after an incident in which respondent followed them in her car, almost hit them, and then screamed at them from the end of their driveway for several minutes. They also described how they could not go anywhere, including into the woods or their own garden or to a neighbor's house, without respondent appearing and photographing, video recording, or shouting at them; including one incident in violation of the PPO. Petitioners' retirement activities include driving around in a golf cart.

Respondent's mother denied that some of petitioners' described incidents were physically possible, because respondent and her mother had only one functional vehicle and it had been far from petitioners' property for the entire day. She and respondent also both referred to the circumstances of the prior *Zlatkin* appeal, generally consistent with the belief that the neighborhood was united against them for, *inter alia*, being female farmers from downstate. They admitted to an incident during which respondent had video recorded petitioners while they were on the property of a neighbor who directly abutted respondent's property. However, they asserted

-2-

that respondent was merely checking her fence, never recorded petitioners, and petitioners approached her first. The video itself was played for the court. They also admitted that one of the vehicular incidents had occurred, but insisted that it was an accident, and respondent pursued petitioners thereafter in an attempt to apologize, not knowing it was petitioners she almost ran into. Respondent contended that she could not have chased petitioners on her tractor, because her tractor was probably not capable of travelling any faster than petitioners' golf cart. Respondent and her mother denied threatening petitioners, and contended that it was in fact petitioners who constantly monitored them.

We have reviewed the video that was submitted by respondent and played for the court. We present a description of the video in some detail, because we believe it provides critical support for the trial court's eventual credibility assessment. The video is approximately 9 minutes long, and it opens with respondent apparently driving by a grassy, fenced-in field. Respondent narrates that she is taking the video to show that she is checking her fence line, but also to document that her abutting neighbor, who had recently been at a local venue called the "Sugar Shack," was now back at his home. Respondent parks, reiterates that she is going to check her fence line, and also comments that "he" is "outside, all of a sudden, like I told the lady at the deposition, that he was out in his yard and this shows the truth that he's out in his yard like I said." She again states that she is going to check the fence line, but also that she is "going to film [the neighbor] out and about in his yard on Friday not even a week after his so-called injury." She alights from her car, and initially does indeed appear to be walking along her fence line. Insofar as we can determine, she is walking south along the western edge of her property, which abuts with the neighbor and is nearly across the road from petitioners.

As respondent walks along the fence, she passes several "no trespassing" signs. Despite repeating that she is checking her fence, it is blatantly obvious that she is in fact primarily pointing the camera at the neighbor's property, where a maroon car and another vehicle (apparently petitioners' golf cart) are visible in the background. She narrates, "and who was with him, on the golf cart, [petitioner JCA]." She then discusses how it is "the deal" that she is checking her fence line. At approximately five minutes into the video, shortly after passing her neighbor's house and with considerably more fencing stretching off into the distance, she notes that her fence wires appear largely sound but in need of some tightening. She then states that she needs to "check the back" and "feed the other animals," and she turns around to return to her vehicle.

On her way back, much of respondent's ongoing narration is unintelligible due to wind noise. She states, "no more bull crap, um, stalking me at Sugar Shack, following me around, [unintelligible] soon as I left mom said he left as well, [unintelligible] getting the video from Missy, it's not my first encounter over the years him showing up at Sugar Shack when I've gone there. So that's the way it is." Shortly thereafter, she states, apparently in reference to her neighbor and petitioners' presence with her neighbor, "I guess there's some other people, good time to view everything, don't know who they all are, guess they're having a little party over there, good time to view, good time to film, that's the way it is." She repeats that the fence appears in reasonable condition.

The video recording is also somewhat shaky and blurry, but it eventually becomes apparent that there are three people, apparently petitioners and the neighbor, on the other side of respondent's fence observing her. Initially, respondent appears to be walking some distance from

them. At just over seven minutes into the recording, respondent shouts, "I'm allowed to check my fence line, thank you." According to respondent's mother's testimony, at some point petitioners or the neighbor began saying, "you stalker, you stalker" to respondent, which we accept as true even though no such statements are audible over the wind noise. Shortly thereafter, respondent begins walking directly towards the people. She shouts, "I'll get right up in your face, you can take a good close one, and I'll take one of you. While I check my fence line." She then shouts, "nice to see you at Sugar Shack, [neighbor]! Did you buy something there? Did you get gas? No, you didn't." One of the people says something unintelligible in response. Respondent shouts back, "Guess what? It's called stalking."

Again, the people on the other side of the fence appear to be saying something, but the wind noise makes it impossible to discern what they are saying. Respondent responds to a statement by saying, "Really? I'm on my own property." The people say something unintelligible, in response to which respondent says, "Yeah." At this point, respondent has stopped moving and is apparently standing close to her fence addressing the people. In response to another unintelligible comment, respondent says, "I don't care, I'm allowed to check my fence line." The people give several unintelligible responses, one of which we think to be, "check it all you want, when are you going to fix it?" Respondent replies, "I did fix some of it." One of the people seems to be make a move-along gesture, and they then walk away from respondent. Respondent initially says, "I didn't say it was all fixed." A few seconds later, she shouts after the people, "Did you enjoy your visit at mister, uh, the Sugar Shack, [neighbor]? No, you didn't buy anything." Respondent then proceeds to walk back along the fence line north. At her vehicle, she says "and that's my conclusion."

The trial court ruled from the bench as follows:

> Very well. In this case, the Court does find that over the course of approximately nine months there was a pattern; there was more than one incident, two or more discontinuous incidents in which the respondent, [SZ], drove her motor vehicle in an intimidating and assaultive way towards [petitioners]. On one occasion, in April of – in April the respondent almost rear-ended the vehicle [petitioners] were in.

> In another incident on July 22nd of 2018, the respondent chased after the golf cart that the [petitioners] were riding in, and did that in a threatening and intimidating way. And then on April 29th there was a near head-on collision as well, and the Court finds that was done deliberately, all of those incidents.

> With regard to the June 3rd incident, the respondent herself really has not denied that, but the respondent's mother has advanced the theory, oh, that was a big misunderstanding. The Court does not find that explanation to be credible – specifically, this would be June 3rd – because it simply is not credible with what the Court has seen of the attitude by the [petitioners] towards [SZ] and [SZ]'s attitude towards the [petitioners], that she almost had a head-on collision with them accidentally. That explanation does not hold water. Further, it does not hold water that [SZ]'s response to that was, gee, that's the [petitioners]; I better throw my vehicle into reverse and chase them back down the hill so I can apologize to them

-4-

for almost demolishing their vehicle in a head-on collision. Nothing I have seen or heard from [SZ] would make me think that that would be her reaction to a situation that was a big, almost, accident.

The Court finds all of these incidents to have been done deliberately by [SZ], and the Court finds all of these incidents were part of a pattern. The Court further finds that each of these incidents would have caused a reasonable person to feel frightened, intimidated, harassed, et cetera, and that that is exactly how these instances of reckless and assaultive driving did make [JCA] feel, and did make [SLA] feel. As a consequence, the Court does find that each of the two petitioners does in fact still need a personal protection order, and the motion filed by [SZ] in each one of the two cases, each one of the two motions are denied, and the personal protection orders will remain in effect in each one of the two cases.

The trial court entered orders accordingly, and this appeal followed.

## II. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's determination whether to issue a PPO because it is an injunctive order. An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes. We review a trial court's findings of fact for clear error. We review de novo questions of statutory interpretation. [*Hayford v Hayford*, 279 Mich App 325, 325; 760 NW2d 503 (2008) (internal citations omitted).]

## III. INITIAL GRANT OF PERSONAL PROTECTION ORDERS

"The petitioner bears the burden of establishing reasonable cause for issuance of a PPO, and of establishing a justification for the continuance of a PPO at a hearing on the respondent's motion to terminate the PPO." *Hayford*, 279 Mich App at 326 (citations omitted). Respondent makes several statements to the general effect that the PPOs should not have been issued in the first place, but respondent fails to support those statements with any meaningful argument. Arguably, they are abandoned. *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Nevertheless, any such argument would be devoid of any conceivable legal merit. MCR 1.109(E)(5).

A PPO may be granted under MCL 600.2950a(1) if a "petition alleges facts that constitute stalking as defined in [MCL 750.411h] or [MCL 750.411i], or conduct that is prohibited under [MCL 750.411s]." Thus, for the *initial* grant of a PPO, the inquiry is whether adequate facts are *alleged*, not proved. MCL 750.411h(1)(d) and MCL 750.411i(1)(e) provide an identical definition of stalking: "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." "Harassment" may include "repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." MCL 750.411h(1)(c), MCL 750.411i(1)(d). "Unconsented contact" may include, in relevant part, "following or

appearing within sight of that individual" or "approaching or confronting that individual in a public place or on private property." MCL 750.411h(1)(e)(*i*)-(*ii*); MCL 750.411i(1)(d)(*i*)-(*ii*). The petitions unambiguously allege a pattern of respondent following and confronting petitioners in manners that would cause any reasonable person to feel fearful or distressed. On their face, the petitions do not appear implausible. Issuance of the PPOs was, therefore, properly within the trial court's discretion.

## IV. REFUSAL TO TERMINATE PERSONAL PROTECTION ORDERS

Respondent argues that the trial court abused its discretion by refusing to terminate the PPOs, relying almost entirely on argument that respondent and her mother were more credible than petitioners. The trial court explicitly found petitioners more credible than respondent and her mother, noting that it had observed all of them during the hearing. This Court generally gives great deference to trial courts' credibility assessments, even where the standard of review is otherwise de novo. *McGonegal v McGonegal*, 46 Mich 66, 67; 8 NW 724 (1881); *Anderson v City of Bessemer City, NC*, 470 US 564, 574-575; 105 S Ct 1504, 1511-1512; 84 L Ed 2d 518 (1985); *In re Loyd*, 424 Mich 514, 535; 384 NW2d 9 (1986). An exception might exist where a party's statement is impossible because it defies physical laws, *People v Lemmon*, 456 Mich 625, 643-646; 576 NW2d 129 (1998), or is "blatantly" contradicted by objective and clear record evidence like a video recording. *Scott v Harris*, 550 US 372, 378-381; 127 S Ct 1769; 167 L Ed 2d 686 (2007). Respondent provides no basis for undermining the trial court's credibility assessment here, and in fact, the objective evidence amply supports it.

Respondent relies heavily on the conclusion that testimony from respondent and her mother was "uncontroverted." Respondent argues that it was specifically uncontroverted that petitioners had been in front of respondent's house at some point on April 29, which proves that petitioners cannot possibly be afraid of respondent, which in turn further proves that petitioners were harassing respondent instead of the other way around. Respondent also argues that in the video recording, petitioners approached respondent first, which is again behavior fundamentally inconsistent with being fearful of her. We find this argument difficult to understand, inconsistent with the evidence, and fundamentally misguided.

Parking in front of someone's house, where they could presumably see the owner coming from some distance easily drive away, does not seem probative of fearfulness. Regarding the video, although petitioners walked to their side of the fence in response to respondent obviously filming them while using her fence as a pretext, respondent appears to have challenged them first, and they walked away from her taunting. Furthermore, respondent was not on a vehicle at that time, and petitioners had a numerical advantage, so the circumstances would not suggest that they should have feared for their safety.

In any event, the statute refers to *conduct* that would and does make a reasonable person feel fearful or threatened. It does not necessarily require unremitting fear of the respondent under any and all circumstances. Repeatedly chasing someone in a car would cause any reasonable person to feel afraid under those circumstances. Constantly photographing or recording someone and thereby invading their privacy would cause any reasonable person to feel afraid of leaving their residence or doing essentially anything. Following someone around for the purpose of recording them would cause any reasonable person to feel intimidated. It is nonsensical to argue

that respondent could not possibly have engaged in a course of harassment that would make a reasonable person feel frightened or intimidated simply because petitioners did not always run away from her.

The video also amply supports the trial court's credibility assessment and gave it an excellent opportunity to observe the parties' treatment of each other outside the courtroom. Respondent's narrative and her taunting interactions with petitioners and her neighbor reflect a person engaged in being a belligerent busybody, at best. Respondent apparently believes that she is disliked for being an outsider from downstate or female. However, the evidence suggests a higher probability that she was not well liked by her neighbors because of the way she chose to conduct herself, including her regular efforts to involve herself in or monitor other people's business without being asked to be involved—and possibly also the difficulty she apparently had in keeping her animals from roaming freely. Respondent does not otherwise provide any coherent argument tending to show that the trial court's credibility assessment was erroneous. *Mitcham*, 355 Mich at 203. Rather, the evidence shows that the trial court had ample basis for concluding that not only did respondent assault petitioners with her vehicle, but she waged a stalking campaign against them and other neighbors.

Finally, respondent asserts that the trial court improperly took petitioners' side "with his over-sympathetic, leading assistance to the [petitioners] during the hearing at times." The portions of the transcript to which respondent cites are mostly just the trial court conducting a direct examination of petitioners and attempting to ensure that the already-too-long proceedings did not drag on longer. We cannot discern any apparent partiality or excessive assistance. On one occasion, the trial court precluded respondent from interjecting, and on another occasion, the trial court admonished respondent's mother not to make faces. In contrast, the trial court repeatedly admonished petitioners that they could not speak, ask questions, or submit evidence, and at one point even specifically told them to act their age. The trial court did apologize for raising its voice. After reviewing the record, we simply cannot comprehend respondent's contention that the trial court handled the proceedings in anything but a fair and impartial manner. Indeed, the trial court appears to have exercised exemplary patience with all parties.

The record amply supports the trial court's refusal to terminate the PPOs.

## V. JUDICIAL MISCONDUCT

Respondent next offers an argument to the general effect that the trial court actually knew that petitioners are more to blame, which, as presented, seems to be an allegation that the trial court intentionally entered an order it knew to be wrong. We find no merit whatsoever in this argument.

Respondent argues that the trial judge "seems to know that it is really [petitioners] who are more to blame" and "knows, deep down, that it's [petitioners] that have the hostile attitude toward [respondent], not the other way around." Respondent relies in part on the fact that in its ruling, the trial court noted that it had observed "the attitude by the [petitioners] towards [SZ] and [SZ]'s attitude towards the [petitioners]." Respondent argues that:

> This slip of the tongue by [the trial judge] is very telling. Why is the attitude of the [petitioners] towards [SZ] mentioned AT ALL, let alone FIRST? It's because [the

trial judge] knows, deep down, that it's the [petitioners] that have the hostile attitude towards Petitioner [sic] [SZ], not the other way around.

If there is any logic in this argument, we cannot find it. It should be obvious that the credibility of *all* parties would be relevant to the trial court's determination, and we cannot fathom the significance of which to mention first. Respondent implicitly asserts that the proceedings or the trial court's ruling must, clearly, be because respondent is a newcomer to the area, but offers no evidence that her status as a newcomer—as opposed to simply being obnoxious, as is far more readily apparent—formed any basis for her neighbors' dislike of her. Respondent also places heavy emphasis on the fact that the trial court only specifically mentioned three of the alleged incidents of vehicular assault and nothing about harassment in its ruling, but provides no argument beyond paranoia the effect that the trial court was required to make an express ruling as to each of the allegations in the petitions. The vehicular assaults were amply sufficient evidence to justify the PPOs.

Respondent does make a reasonable argument: that one of the incidents could not possibly have been intentional, because the evidence showed it occurred as she was on her way back from a store 20 minutes away, she was admittedly driving less responsibly than she should, and she had no way to predict that petitioners would be on the road when she encountered them. However, although reasonable, nothing in the record precludes the possibility that respondent recognized petitioners through their windshield and took the opportunity to terrify them. Respondent argues that "if there had been intent, the police that had investigated would surely have charged Petitioner [sic] or at least issued her a ticket," but they did not. We think it a matter of common knowledge that the police do not necessarily issue citations or recommend prosecution every time they could. Respondent has failed to establish any clear error or misconduct by the trial court, or any reason why we should interfere with the trial court's clearly well-supported credibility assessment.

## VI. CONSTITUTIONALITY OF PERSONAL PROTECTION ORDERS

Respondent argues, for the first time on appeal, that the PPOs violate her constitutional rights. In civil cases, constitutional claims raised for the first time on appeal may not necessarily be subject to review. See *Michigan Up & Out of Poverty Now Coalition v State*, 210 Mich App 162, 167-168; 533 NW2d 339 (1995). Unpreserved constitutional issues, if reviewed, are reviewed de novo for clear error affecting substantial rights. *Saginaw Ed Ass'n v Eady-Miskiewicz*, 319 Mich App 433, 450-451; 9021 NW2d 1 (2017).

Respondent first argues that the prohibition in the PPOs against "posting a message through the use of any medium of communication, including the internet or a computer or any electronic medium, pursuant to MCL 750.411s" is unconstitutional because there was no evidence that respondent made a threatening or defamatory communication toward petitioners. We doubt respondent did not engage in any threatening communications. However, petitioners did not set forth any allegations or testimony tending to suggest that respondent had engaged in any electronic communications with them or made any online posts regarding or directed at them. This Court has held that a similar prohibition, in the absence of threats, defamation, or statements likely to incite lawlessness, is an unconstitutional restraint on the First Amendment right to freedom of speech. *TM v MZ*, 326 Mich App 227, 236-244; 926 NW2d 900 (2018). Thus, *TM* would seem, superficially, to suggest that the prohibition against "posting a message through the use of any

medium of communication, including the internet or a computer or any electronic medium" arguably constitutes clear error.

Nevertheless, the analysis in *TM* pertained to a different factual situation and, probably as a consequence, did not set forth a totally complete analysis of the United States Supreme Court's precedent regarding the extent to which speech may be restricted by a state. We do not wish to imply that *TM* was wrongly decided under the facts of that case. However, seemingly broad, expansive, and absolute language in an opinion should not be applied in a mechanistic manner without considering the context in which the language was used by the court, which may limit the appropriate application of that language. See *New Products Corp v Harbor Shores BHBT Land Devel*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 344211), slip op at p 10. We do not think TM controls the outcome in this matter.

In *TM*, this Court correctly observed that the state may prohibit " 'words which by their very utterance inflict injury,' " noting that such words may *include* such things as "fighting words" or "true threats." *TM*, 326 Mich App at 238, quoting *Virginia v Black*, 538 US 343, 359; 123 S Ct 1536; 155 L Ed 2d 535 (2003). In *Virginia*, the United States Supreme Court cited cases holding that those examples are not exclusive. Insults, epithets, and personal abuse may not be constitutionally protected speech. *Chaplinski v State of New Hampshire*, 315 US 568, 572; 62 S Ct 766; 86 L Ed 1031 (1942). Abusive, vicious, hostile, or otherwise colorful invective is protected speech when made in the pursuit of self-expression; however, such expressions may constitute proscribable conduct under other circumstances, and the state may target that conduct. *RAV v City of St. Paul, Minn*, 505 US 377, 385-395; 112 S Ct 2538; 120 L Ed 2d 305 (1992).

The parties in *TM* were, at least in part, political rivals. *TM*, 326 Mich App at 230. It stands to reason that prohibitions against either of them speaking publicly about the other seriously risked undermining constitutionally protected speech. Even if " '[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause,' " *id*. at 240, quoting *Saxe v State College Area Sch Dist*, 240 F 3d 200, 204 (CA 3, 2001),[1] pure harassment masquerading as "speech" may be properly proscribed either as conduct irrespective of content, or as speech that intrinsically causes injury.

We therefore find that no plain error occurred. Furthermore, even if plain error did occur, respondent does not present a persuasive argument that the prohibition is affecting her substantial rights. Unlike the situation in *TM*, respondent would not be entitled to rescission of the PPO entirely. Cf. *TM*, 326 Mich App at 233-234. No evidence was presented in the trial court tending to suggest that respondent had any intention or history of posting anything online, or that she even knew how to do so. Respondent also presents no such argument on appeal. Indeed, although respondent would not be entitled to expand the record on appeal, she does not even make the effort to provide any evidence showing that the prohibition is in any way practically damaging to her. Thus, whether or not plain error occurred, we are unpersuaded that respondent is entitled to any relief.

---

[1] Decisions of lower federal courts may be persuasive, but they are not binding on this Court. *Abela v General Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

Respondent also argues that the prohibition in the PPO against following or appearing within sight of petitioners is unconstitutional because it effectively precludes her from using or maintaining the corner of her property nearest to petitioners' property. Under the circumstances, it is obvious from respondent's video recording that if she were allowed to make unrestricted use of that corner of her property, she would simply return to the same conduct that necessitated the PPOs in the first place and use maintenance as a pretext to engage in further taunting, surveillance, or other harassment. Respondent's claim that she "doesn't do any of those things anyway" regarding stalking activities rings hollow. Respondent clearly cannot be trusted not to use access to her property as a pretext, and she does not seek any kind of compromise, such as conditioning the use of her property on not possessing or using any photo, video, or audio equipment while within range of petitioners' property. Furthermore, again, respondent did not make this argument in the trial court. We therefore do not find clear error affecting respondent's substantial rights.

Affirmed. We direct that because petitioners did not actively participate in this appeal, the parties shall bear their own costs. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Deborah A. Servitto
/s/ James Robert Redford

-10-