**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:       Justices:
Clifford W. Taylor   Michael F. Cavanagh
                     Elizabeth A. Weaver
                     Marilyn Kelly
                     Maura D. Corrigan
                     Robert P. Young, Jr.
                     Stephen J. Markman

**FILED FEBRUARY 1, 2005**

In re:

The Honorable JAMES P. NOECKER,
Judge 45th Circuit Court
Centreville, MI  49032,

No. 124477

_____

BEFORE THE ENTIRE BENCH

KELLY, J.

This appeal is from the recommendation of the Judicial Tenure Commission (JTC) that respondent 45th Circuit Judge James P. Noecker be removed from office and required to pay the costs of his prosecution.  We determine that respondent should be removed from office but that costs should not be assessed against him.

## I. Factual Background

On March 12, 2003, respondent was involved in a motor vehicle accident in Sturgis, Michigan.  The vehicle he was driving turned from a road into the parking lot of a store, the Klinger Lake Trading Post.  According to witnesses, respondent's vehicle neither accelerated nor decelerated.

Rather, it maintained a speed of approximately three to five miles an hour. The vehicle hit the corner of the store, causing significant damage to the building and to the inventory in the store.

Respondent emerged from the vehicle, entered the store, and asked if anyone had been injured. The store's proprietor, Mrs. Pankey, was upset and repeatedly stated that she wanted someone to find her husband, who was ice fishing on a local lake. Although respondent lacked any information to assist him in the search for Mr. Pankey beyond the name of the lake, respondent left the scene of the accident. He claimed that he did so to help Mrs. Pankey.

No one indicated where on the lake Mr. Pankey was fishing. Respondent believed that he was near a fishing access, but was unsure where the access was located. Mrs. Pankey testified that respondent did not know what her husband looked like. He did not know what vehicle Mr. Pankey was driving. He did not even know the color of the coat Mr. Pankey was wearing.

Respondent testified that, in the course of his search, he first drove to the lake. He got out of the car to look around and saw two objects he presumed were people on the far side of the lake. He then spent several minutes

2

considering whether he could walk across the ice.  Deciding that it was unsafe, he returned to his vehicle.

Respondent said that he then stopped at another point along the lake, walked down to the water's edge, and tried unsuccessfully to find an access point.  He saw five or six people in a cove and again considered whether it was safe to walk out on the ice.  Deciding that it was unsafe, he drove farther around the lake to a gated area known as Camp Fort Hill.  Unable to enter, he started back to the store, but decided instead to drive to his residence.

On arriving home, respondent told his wife about the accident, then called Mrs. Pankey.  He testified that he wanted to ask Mrs. Pankey if she had heard from her husband, and, if not, he wanted to know the location of the lake's access point.  He testified that he never got a chance to ask those questions, because as soon as he identified himself, Mrs. Pankey began screaming hysterically.  She kept repeating, "You get back here."  He told her he would return.

Respondent then learned that the state police were en route to his house to speak with him.  He decided not to return to the store.  He testified that his wife took his blood pressure.  The systolic reading was 220.  Respondent did not call his doctor or the emergency room.  Rather, he testified, he poured and drank three to five ounces of

vodka. He testified that he knew that the police were coming to speak with him about the accident. But he stated that the effect that his consumption of alcohol would have on the officers' investigation of his car accident did not trouble him at the time.

When the police arrived at his home, respondent told them that he had consumed three to five ounces of vodka after returning from the search for Mr. Pankey. Respondent agreed to take a preliminary breath test. The breath test was administered approximately two hours after the accident. The reading was 0.10.[1]

A state trooper who investigated the accident at the scene, Craig Wheeler, testified that he was concerned that alcohol may have been a factor. Sergeant Steven Barker testified that there are generally three reasons people leave the scene of an accident: their license has been suspended, there is an outstanding arrest warrant for them, or they drank alcohol before the accident.

Sergeant Barker accompanied Trooper Wheeler to respondent's home on the night of the accident. He testified that respondent appeared to move away from him

---

[1] This value refers to the amount of alcohol in an individual's system. At the time of the accident, Michigan law made it unlawful for someone to operate a vehicle where "[t]he person has an alcohol content of 0.10 grams or more per 100 milliliters of blood, per 210 liters of breath, or per 67 milliliters of urine." MCL 257.625(1)(b).

whenever he got close. One of the officers testified that, when he confronted respondent about an apparent inconsistency in his statement, respondent commented, "I know you are in a position to fry me." In addition to the testimony of Trooper Wheeler and Sergeant Barker, several witnesses to the accident testified that it appeared that respondent had been drinking at the time of the accident.

Respondent gave conflicting stories about how the accident had occurred. One explanation was that he intended to depress the brake pedal, but accidentally pushed the accelerator when his shoe slipped. Another explanation was that, as he approached the building, he intended to brake, but he forgot that his foot was not on the brake pedal. Instead, he depressed the accelerator, which caused the vehicle to shoot forward and strike the building.

## II. Proceedings Below

The events occurring after the March 12 accident, including respondent's conflicting explanations to the media, caused the JTC to issue a formal complaint against respondent.

The complaint may be summarized as alleging the following misconduct:

> 1. Persistent use of alcohol leading to a variety of violations of the Michigan

5

Constitution, the Michigan Court Rules, and the Canons of Judicial Conduct.

2. Violations of the law and making false statements to the police regarding the events surrounding a motor vehicle accident on March 12, 2003.

3. Making false statements to the JTC.

The complaint may be summarized as alleging that

respondent's conduct constituted:

1. Misconduct in office, as defined by Const 1963, art 6, § 30, as amended, and MCR 9.205;

2. Conduct clearly prejudicial to the administration of justice, as defined by Const 1963, art 6, § 30, as amended, and MCR 9.205;

3. Habitual intemperance, as defined by Const 1963, art 6, § 30, as amended, and MCR 9.205;

4. Persistent failure to perform judicial duties, as defined by Const 1963, art 6, § 30, as amended, and MCR 9.205;

5. Persistent neglect in the timely performance of judicial duties, contrary to MCR 9.205(B)(1)(b);

6. Irresponsible or improper conduct that erodes public confidence in the judiciary, contrary to the Code of Judicial Conduct, Canon 2(A);

7. Conduct involving impropriety and the appearance of impropriety, contrary to the Code of Judicial Conduct, Canon 2(A);

8. Failure to respect and observe the law, contrary to the Code of Judicial Conduct, Canon 2(B);

9. Conduct violative of MCR 9.104(A)(1), (2), and (3) in that such conduct,

(i) is prejudicial to the proper administration of justice,

6

(ii) exposes the legal profession or the court to obloquy, contempt, censure, or reproach; and

(iii) is contrary to justice, ethics, honesty, or good morals.

Retired Circuit Judge John N. Fields was appointed master in the case, heard evidence, and made forty specific findings of fact. On reviewing all the evidence, he concluded that respondent violated the court rules and canons listed above.

The JTC adopted the master's report and unanimously recommended that this Court remove respondent from the bench. In addition, in a split decision, it recommended that respondent be required to pay the costs that the JTC incurred in prosecuting the matter.

Three JTC members concurred. They thought that respondent should also be required to pay the costs incurred for visiting judges to hear respondent's docket during his interim suspension. A separate JTC concurrence/dissent agreed with the recommendation for removal, but argued that costs should not be assessed against respondent.[2]

---

[2] We shall refer to these opinions as they are titled. The concurring opinion will be referred to as the "JTC concurrence." The opinion objecting to requiring respondent to pay the costs of his prosecution will be referred to as the "JTC concurrence/dissent."

7

### III.  Issues on Appeal

Respondent asks this Court to reject the JTC's recommendation. He asserts that there is insufficient evidence to find him guilty of judicial misconduct. He also argues that the master erred in allowing the introduction of improper expert evidence. Finally, respondent contests the recommendation that he be required to pay the costs of his prosecution.

### IV.  Relevant Standards

We review the JTC's factual findings and its disciplinary recommendations de novo. *In re Chrzanowski*, 465 Mich 468, 478-479; 636 NW2d 758 (2001). The standard of proof in a judicial discipline proceeding is a preponderance of the evidence. *In re Loyd*, 424 Mich 514, 521-522; 384 NW2d 9 (1986).

### V.  The Commission's Recommendation

In making its recommendation, the JTC applied the factors enunciated in *In re Brown*, 461 Mich 1291, 1292-1293 (2000). It listed each factor, relating it to the circumstances of the case. It explained how it weighed each factor for or against respondent. Furthermore, the JTC considered the fact that respondent has extensive prior involvement with the judicial disciplinary system, having been admonished on various occasions for failing to timely complete court work.

8

The JTC concluded that respondent's failure to be truthful regarding the automobile accident and its aftermath justifies his removal from office.  It found that respondent misled the police and later provided inconsistent accounts of the events.  Also, it found that he failed to offer credible testimony when under oath in the public hearing.

Furthermore, the JTC indicated that docket delays caused by respondent had a deleterious effect on the administration of justice in St. Joseph County. The JTC acknowledged that a number of attorneys testified in respondent's favor.  But it noted that their testimony did not alter the fact that the court docket and the public suffered because of respondent's conduct.  The JTC concluded that respondent is guilty of repeated serious misconduct that requires his removal from office.[3]

A. The Sufficiency of the Evidence

The power to discipline a judge resides exclusively in this Court, but it is exercised on recommendation of the JTC. Const 1963, art 6, § 30.  Respondent's complaints with regard to the master's factual findings amount to a

---

[3] The examiner indicated at oral argument that "[I]t's fair to say that if the crash had never taken place we would not necessarily be making a recommendation for removal . . . . I think the gravamen of this is the lying, and that truly should be the focus . . . ." We agree.

disagreement about the weight and credibility that should be afforded to the various witnesses. The master, as trier of fact, was in the best position to assess the credibility of the witnesses. "Our power of review de novo does not prevent us from according proper deference to the master's ability to observe the witnesses' demeanor and comment on their credibility." *In re Loyd*, *supra* at 535.

On review of the entire record, we agree with the master's findings of fact and conclusions of law. Respondent left the scene of an automobile accident. Eyewitnesses testified that respondent appeared intoxicated at the time of the accident. As a former prosecutor and a judge, respondent knew that he should have stayed at the scene of the accident. It is not credible that, after being made aware that the police were on their way to question him about his accident, he consumed alcohol.

We conclude that respondent was under the influence of alcohol when he ran his car into the store. We conclude that he attempted to deceive the police about this fact because he was motivated by a desire to avoid criminal prosecution. We conclude that he continued to misrepresent the cause of the accident to the JTC and the master,

motivated in addition by a desire to avoid professional discipline.[4]

The preponderance of the evidence justifies a finding that respondent was guilty of judicial misconduct, notwithstanding the exculpatory evidence on which he relies. Nothing in the record suggests that Judge Fields erred in his findings and conclusions in any manner that would change the outcome of the proceedings. To the contrary, we believe that Judge Fields fairly and objectively presided over this case. Therefore, we agree with the JTC that respondent's significant misrepresentations of the truth made in testimony and to the public warrant disciplinary action.

### B. The Qualifications of the Expert Witness

Respondent argues that the examiner's expert, Harvey Ager, M.D., was not qualified to testify. Dr. Ager is a psychiatrist who testified about the conduct typical of an alcoholic.

MRE 702 provides the rule for expert testimony:

---

[4] One of respondent's more peculiar explanations for the cause of the accident occurred during his testimony before the master. There, respondent testified that he entered his vehicle through the passenger door and operated the vehicle while straddling the console because he had "mud on his shoes." Respondent indicated to the master that he "used his left foot to accelerate and brake because his right foot remained straddled over the center console."

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Respondent argues that Dr. Ager's failure to publish, present, or conduct peer review on the topic of alcoholism in the recent past disqualifies him from testifying as an expert. He is mistaken.

The master noted that, although Dr. Ager had not recently published or made presentations on the topic, there was evidence that he

is a graduate of Wayne State University. That he is a board certified psychiatrist. That he is a former codirector of the alcoholism unit at Detroit Memorial Hospital. . . . [T]hat he has treated hundreds of individuals with respect to alcoholism. . . . I do find that his experience in this area in addition to his general medical training is such that he is qualified as an expert to testify and render an opinion regarding conduct consistent with alcoholism.

The master ruled that Dr. Ager could testify as long as his testimony conformed with the requirements of MRE 702. He noted that "there has been nothing here to suggest that this sort of testimony would not be based upon reliable principals [sic] and methods."

12

Dr. Ager's testimony conformed with the requirements of MRE 702. On the basis of his experience, he testified about what conduct is consistent with that of an alcoholic. He also testified about his personal interaction with respondent in a ninety-minute interview.

Contrary to respondent's assertions, Dr. Ager did not testify outside the bounds of his knowledge. He did not state that respondent's alcoholism caused his docket delays. He testified simply about the behavior one could expect from an alcoholic.

Dr. Ager did not view respondent's work product and did not comment on the quality of respondent's work. Nor was Dr. Ager introduced to testify regarding respondent's work product. The fact that Dr. Ager was unfamiliar with the work of respondent and the extent of Dr. Ager's experience with alcoholics go to the weight to be given his testimony. They are not determinative of whether his testimony conformed with the requirements of MRE 702.

We find that Dr. Ager qualified as an expert witness. His testimony complied with MRE 702 and, therefore, was admissible.

## VI. Appropriate Discipline

Having determined that the JTC proved the charges by a preponderance of the evidence, we must assess whether the recommended discipline is appropriate to the offense. "Our

primary concern in determining the appropriate sanction is to restore and maintain the dignity and impartiality of the judiciary and to protect the public."  *In re Ferrara*, 458 Mich 350, 372; 582 NW2d 817 (1998).

Central to our decision to remove respondent is our conclusion that respondent misled the police, the public, and the JTC about his drinking on March 12, 2003. Respondent's insistence that he was sober at the time of the accident is not credible.  His misrepresentations about being sober when he caused an automobile accident that carried civil and criminal consequences are antithetical to his judicial obligation to uphold the integrity of the judiciary.  Respondent's repeated deception and the publicity surrounding the incident have seriously eroded the public's confidence in him and in the judiciary.

Unfortunately, we have on other occasions dealt with a judge's dishonesty.  In *In re Ferrara*, *supra*, this Court determined that Judge Andrea J. Ferrara's conduct in misleading the master after her original alleged misconduct surfaced justified her removal from office.  During the hearing on the complaint, Judge Ferrara twice attempted to introduce a fraudulent letter into evidence.  We determined that her misrepresentations and deception eroded the public's trust and confidence in the judiciary.  We found

14

it necessary to remove Judge Ferrara from the bench in order to restore public trust and confidence. *Id.* at 373.

Likewise, the nature of respondent's lies, and the apparent motives behind them, have seriously harmed the integrity of the judiciary. Respondent's continued deception before the JTC has seriously undermined the public's faith that judges are as subject to the law as those who appear before them. His continued dishonesty with regard to the events of March 12, 2003, justifies his removal from office.

Furthermore, respondent's persistent docket problems, for which he was admonished on several occasions, violate the standards of judicial conduct. Were this proceeding solely about his docket problems, we would not find removal an appropriate form of discipline. However, respondent's deception surrounding the March 12 accident described herein warrants the harsh sanction of removal from office.

### VII. The Assessment of Costs

The Michigan Constitution created the Judicial Tenure Commission and outlines the power of the Michigan Supreme Court to discipline judges:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties,

15

habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings. [Const 1963, art 6, § 30(2).]

Pursuant to this constitutional provision, the Court has promulgated court rules governing judicial discipline proceedings. As the JTC noted, no specific court rule or statute provides for imposing costs in judicial disciplinary matters.

We have imposed costs in several cases in the past. The JTC majority relies on those cases in support of its assessment of costs here. But those cases are not on point. In *In re Thompson,*[5] costs were recommended and ordered, but the judge did not contest them. Likewise, in *In re Trudel,*[6] costs were ordered. By then, however, Judge Trudel had resigned from the bench. In *In re Cooley,*[7] Judge Cooley consented to the commission's decision and recommendation, including the assessment of costs. In the present action, respondent did not consent to the JTC's recommendation, nor has he resigned. Rather, he has challenged the JTC's findings and its recommendation that costs be assessed.

---

[5] 470 Mich 1347 (2004).

[6] 468 Mich 1243 (2003).

[7] 454 Mich 1215 (1997).

16

We agree with the JTC concurrence/dissent that a respondent is entitled to notice of what conduct will subject the respondent to the assessment of costs. Past decisions of this Court have not provided notice because they were issued without explanation of the standards used in assessing costs.

We agree with the JTC concurrence/dissent's observation:

> Respondent Noecker cannot be said to have been given notice of the standards to be applied and the type of expenses that could be assessed in this case. . . . The imposition of actual costs has been extremely rare in the history of reported cases. The commission has not set standards for the imposition of costs until today. Therefore, imposition of costs in this case, if the Supreme Court believes they are authorized by law, would violate the spirit of *In re Brown*.

Where a judge has been given no notice of the standards for imposing costs, the judge should not be made to pay them. We leave for another time the determination whether the assessment of costs is consistent with the Michigan Constitution. In this case, respondent should not be required to pay the costs of his prosecution because he had no notice of the standards for imposing them.

We have opened an administrative file to consider the constitutional issue and the standards to be applied in the event costs can be assessed in these matters. ADM 2004-60.

17

## VIII. Conclusion

After a careful examination of the evidence and an evaluation of the findings of fact, we conclude that removal of respondent from the bench is warranted.

We hereby order respondent removed from office. Pursuant to MCR 7.317(C)(3), the clerk is directed immediately to issue an order to that effect. No costs will be assessed.

                          Marilyn Kelly
                          Clifford W. Taylor
                          Maura D. Corrigan
                          Robert P. Young, Jr.


WEAVER, J.   I join in parts I through VI.

                          Elizabeth A. Weaver

S T A T E   O F   M I C H I G A N

SUPREME COURT

In re:

The Honorable JAMES P. NOECKER,
Judge 45th Circuit Court
Centreville, MI  49032,                                    No. 124477
_____

YOUNG, J. (*concurring*).

I fully concur in the majority opinion. I write separately, however, to explain why I believe removal to be the appropriate sanction in this case.

The purpose of Judicial Tenure Commission proceedings is not the punishment of the judge, but to maintain the integrity of the judicial process and to protect the citizenry from corruption and abuse. As such, this Court's primary concern in determining the appropriate sanction is to restore and maintain the dignity and impartiality of the judiciary and to protect the public.[1]

After reviewing the evidence in this case, I believe that the evidence establishes respondent was intoxicated at the time of the collision. Respondent left the scene of the accident and constructed several inconsistent explanations in order to avoid criminal responsibility for his

_____

[1] *In re Jenkins*, 437 Mich 15; 465 NW2d 317 (1991); *In re Ferrara*, 458 Mich 350; 582 NW2d 817 (1998).

intoxicated driving. More egregious, respondent also lied *under oath* during the course of the Judicial Tenure Commission investigation, presumably in order to avoid judicial disciplinary consequences.

Our judicial system has long recognized the sanctity and importance of the oath.[2] An oath is a significant act, establishing that the oath taker promises to be truthful. As the "focal point of the administration of justice,"[3] a judge is entrusted by the public and has the responsibility to seek truth and justice by evaluating the testimony given under oath. When a judge lies under oath, he or she has failed to internalize one of the central standards of justice and becomes unfit to sit in judgment of others.

Certainly, Judicial Tenure Commission proceedings are intended to be remedial, not penal.[4] The vast majority of misconduct found by the Judicial Tenure Commission is not fatal; rather, it reflects oversight or poor judgment on

---

[2] See *June v School Dist No 11*, 283 Mich 533, 537; 278 NW 676 (1938) ( An oath is "'[a]n external pledge or asseveration, made in verification of statements made, or to be made, coupled with an appeal to a sacred or venerated object, in evidence of the serious and reverent state of mind of the party, or with an invocation to a supreme being to witness the words of the party, and to visit him with punishment if they be false.'") (citation omitted).

[3] *In re Callanan*, 419 Mich 376, 386; 355 NW2d 69 (1984).

[4] *In re Probert*, 411 Mich 210; 308 NW2d 773 (1981).

2

the part of a fallible human being who is a judge. However, some misconduct, such as lying under oath, goes to the very core of judicial duty and demonstrates the lack of character of such a person to be entrusted with judicial privilege.

Where a respondent judge readily acknowledges his shortcomings and is completely honest and forthcoming during the course of the Judicial Tenure Commission investigation, I believe that the sanction correspondingly can be less severe. However, where a respondent is not repentant, but engages in deceitful behavior during the course of a Judicial Tenure Commission disciplinary investigation, the sanction must be measurably greater. Lying under oath, as the respondent has been adjudged to have done, makes him unfit for judicial office.

It is for these reasons that I support respondent's removal from office.

Robert P. Young, Jr.
Clifford W. Taylor
Maura D. Corrigan

3

In re:

THE HONORABLE JAMES P. NOECKER,
JUDGE 45TH CIRCUIT COURT
CENTREVILLE, MI  49032,                          No. 124477
_____

WEAVER, J. (*concurring*).

I agree that Judge Noecker should be removed from the bench and join parts I – VI of the majority opinion.  The accident, Judge Noecker's conduct following the accident, and his attempts to deceive the public and the police with incredible explanations of the accident are clearly prejudicial to the administration of justice and undermine the public's trust and confidence in the judiciary.  Therefore, removal is the appropriate discipline.

I also concur in the result that Judge Noecker should not be assessed costs, but for different reasons.  Rather than rely on a lack of notice or standards as the reason not to assess costs, I would not assess costs because it appears to me that this Court has no constitutional authority to assess the judge for the costs of the proceedings.  Const 1963, art 6, § 30 provides that "the supreme court may censure, suspend with or without salary, retire or remove a judge . . . ."  Nothing in this

constitutional provision gives this Court any authority to discipline the judge by assessing the judge the costs of the Judicial Tenure Commission proceedings against him or her.

Elizabeth A. Weaver

In re:

THE HONORABLE JAMES P. NOECKER,
Judge, 45th Circuit Court
Centreville, MI 49032

No. 124477

_____

MARKMAN, J. (*concurring*).

I concur with the results of the majority opinion, as well as with much of its analysis.  Had I been a member of the Judicial Tenure Commission (JTC), I might possibly have reached a different conclusion in terms of an appropriate sanction, for there is much with which I agree in the dissenting opinion.  In particular, I agree with the dissenting opinion that more egregious behavior on the part of judges has, in the past, been met with less sanction than permanent removal.  *Post* at 1.  Further, I believe that the thirty-five years of honorable public service on the respondent's part deserve more consideration in the formulation of a sanction than, to my eye, has been given here.

Nonetheless, I concur with the majority opinion because, as it correctly notes, "'[o]ur power of review de novo does not prevent us from according proper deference'"

to the processes of the JTC. *Ante* at 10 (citation omitted). While the majority emphasizes the deference due the "'master's ability to observe the witnesses' demeanor and comment on their credibility,'"[1] *id.*, I would also emphasize the deference due the commission in its recommendation of a sanction. In *In re Brown*, 461 Mich 1291 (2000), this Court directed the commission to more clearly articulate its standards in determining an appropriate judicial sanction, and we set forth a number of non-exclusive factors to be considered in this process. We stated in this regard:

> As a constitutionally created state agency charged with making recommendations to this Court concerning matters of judicial discipline, the JTC is entitled, on the basis of its expertise, to deference both with respect to its findings of fact and its recommendations of sanction. However, such deference cannot be a matter of blind faith, but rather is a function of the JTC adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline.
>
> * * *
>
> . . . Where standards of this sort have been promulgated and reasonably applied to individual cases, this Court owes considerable deference to the JTC. [461 Mich at 1292, 1293]

_____

[1] I concur with the majority in its conclusion that the master "fairly and objectively" presided over this case.

2

The commission here, in my judgment, has conscientiously evaluated the factors set forth in *Brown*, as well as additional factors, and has "adequately articulated the bases for its findings." Although personal consideration of these factors might have led me in the direction of the sanction set forth in the dissenting opinion, I cannot say that there is no "reasonable relationship between [the commission's] findings and the recommended discipline." Rather, I believe that the commission has identified such a relationship and therefore is entitled to deference by this Court.

It was proper for this Court to promulgate the *Brown* factors so that we could derive the "additional information necessary to perform [our] constitutional function of judicial discipline under Const 1963, art 6, § 30(2)." *Brown, supra* at 1291. Having promulgated these factors, and the commission having reasonably considered them, "proper deference" is now required on our part. While such deference is that which is owed to any executive or administrative agency, the constitutional status of the commission, Const 1963, art 6, §30, underscores the necessity of such deference in matters of judicial

discipline.  On the basis of such deference, I concur with the conclusions of the majority opinion.

Stephen J. Markman

S T A T E   O F   M I C H I G A N

SUPREME COURT

In re:

THE HONORABLE JAMES P. NOECKER,
Judge, 45th Circuit Court
Centreville, MI 49032                                    No. 124477

_____

CAVANAGH, J. (*dissenting*).

Viewing all the alleged conduct at issue here, I cannot conclude that respondent's removal is warranted. Much more egregious behavior on the part of judges has been met with far less sanction than permanent removal. See *In re Hathaway*, 464 Mich 672; 630 NW2d 850 (2001) (suspending the judge for six months without pay for the judge's gross mishandling of three cases and overall "lack of industry"); *In re Brown (After Remand)*, 464 Mich 135; 626 NW2d 403 (2001) (suspending the judge for fifteen days without pay after finding that the judge misused the prestige of his office in addition to having four previous instances of misconduct); *In re Moore*, 464 Mich 98, 132-133; 626 NW2d 374 (2001)[1] (characterizing the judge's "pattern of persistent interference in and frequent interruption of the

_____

[1] I concurred, writing that I would have imposed the sanction of nine months without pay recommended by the Judicial Tenure Commission.

trial of cases; impatient, discourteous, critical, and sometimes severe attitudes toward jurors, witnesses, counsel, and others present in the courtroom; and use of a controversial tone and manner in addressing litigants, jurors, witnesses, and counsel" as warranting a six-month suspension without pay); and *In re Bennett*, 403 Mich 178; 267 NW2d 914 (1978) (refusing to remove the judge from the bench, despite finding that he engaged in "demonstrably serious" intemperance, instead imposing a one-year suspension without pay).

In *In re Seitz*, 441 Mich 590; 495 NW2d 559 (1993), on which the Judicial Tenure Commission (JTC) relies, this Court removed the judge from office at the JTC's recommendation. I find that case easily distinguishable. Judge Seitz exhibited such unfathomable conduct toward his colleagues and staff for over ten years that it took this Court twenty-seven pages to delineate it. *Id.* at 594-621. He also engaged in felonious conduct by installing a wiretap on his phone. *Id.* at 597-599. Moreover, he abused his contempt power by deliberately ordering a person to ignore an administrative order of the chief judge and follow Judge Seitz's contradictory order instead. When the person refused to do so, Judge Seitz had him arrested and brought to the courtroom. There, the judge performed a

mock hearing devoid of due process and had the person jailed. *Id.* at 599-604. Judge Seitz also had unprofessional personal relationships with his staff. *Id.* at 604-611.

The JTC points to one paragraph in *Seitz*, *supra* at 622, that pertained to the judge's failure to file reports with the State Court Administrative Office as support for its removal recommendation. But Judge Seitz's failures in that regard paled in comparison to his other conduct, and it is impossible to believe that his failure to file several reports alone would have resulted in his removal from the bench. Similarly here, where the two allegations are that respondent lied about the accident and failed to properly manage his docket, the JTC's removal request is extremely harsh.

The JTC relies on two cases, *In re Ferrara*, 458 Mich 350; 582 NW2d 817 (1998), and *In re Ryman*, 394 Mich 637; 232 NW2d 178 (1975), for the proposition that lying, by itself, is sufficient to remove respondent from the bench. But in both cited cases, more was at issue. For instance, in *Ferrara*, the misconduct charges stemmed from the revelation of eleven tapes on which the judge was recorded lashing horrific racial and ethnic slurs at or about people in both her personal and professional life. This Court

found that irrespective of the tapes, Judge Ferrara's conduct surrounding the investigation was grounds for removal. For instance, Judge Ferrara told the media and the JTC that the tapes were fabricated, and she attempted to admit a fraudulent letter twice, the second time after her first attempt was rejected. Additionally, the judge's conduct during the formal hearing was so "'inappropriate, unprofessional, and demonstrat[ive of] a lack of respect for the judicial discipline proceedings,'" that this Court found the incidents too numerous to recount. *Ferrara, supra* at 370 (citation omitted).

Because of the severe and obvious nature of the judge's lies and her continuing disrespect for the judiciary, this Court concluded that removal was warranted, stating:

> We adopt the commission's recommendation and find respondent's untruthful and misleading statements to the public and press, her attempt to commit a fraud on the Court by twice attempting to introduce the Avela Smith letters, and her unprofessional and disrespectful conduct during each stage of the proceedings to constitute misconduct in violation of the court rules and judicial canons. [*Id.* at 372.]

Similarly, *Ryman, supra*, involved issues of backdating and improper signing of deeds, false testimony, allowing a court clerk to perform a magistrate's duties, and continuing the practice of law after becoming a judge. *Ryman, supra* at 642-643. In my opinion, neither *Ferrara*

4

nor *Ryman* supports the JTC's assertion that a *suspected* lie is sufficient to remove a judge from office.

In sum, I do not believe there is support for permanently removing respondent from office. It seems that where a judge has been removed from office at least in part for lying, the fact that the suspected lies were indeed lies was uncontroverted. Here, though, while respondent's story about the accident is undeniably suspicious, there is no proof that respondent lied. Without more than speculation that respondent was being untruthful in denying that he drank before he drove, the most severe punishment hardly seems fitting.

Additionally, I do not think that the JTC adequately supported a finding that respondent's admitted alcoholism caused his perceived administrative failures. The logic behind the asserted causal connection was flawed: even though respondent admits abusing alcohol, it does not necessarily follow that his shortcomings on the job are related to that abuse. The expert testimony did nothing to assist in establishing the link between alcohol abuse and work performance. If anything, Dr. Miller's testimony blurred the connection by pointing to a possible obsessive-compulsive disorder as the cause of respondent's work-related problems.

In any event, respondent had plausible explanations for at least some of his work-related behavior. And no one has ever seen respondent drinking or drunk on the job, including his long-time clerk. No attorney testified negatively about respondent's behavior in court, and some offered reasons for case delays that were totally unrelated to respondent. And notably, the JTC admitted at oral argument that its inclusion of these work-related shortcomings were but "a footnote" to the gravamen of its investigation, the accident.

I, therefore, cannot accept the JTC's recommendation of removal. Although I believe that its finding that the crash was alcohol-related is supported on the record, a much lesser sanction is warranted, and the sanction should be tailored to that particular event. As such, I would suspend respondent, without pay, for a period of fifteen months, until May 1, 2006.

In light of my conclusions, I do not see grounds for imposing the costs of the JTC's prosecution on respondent, particularly in light of its admission that its request for reimbursement is unprecedented and unsupported by the court rules.

Michael F. Cavanagh

6