*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LOUIS MARTIN CAMPOS,

        Defendant-Appellant.

UNPUBLISHED
January 11, 2024

No. 359004
Gogebic Circuit Court
LC No. 21-000024 FC

Before: BOONSTRA, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of criminal sexual conduct in the first degree (CSC-I), MCL 750.520(b)(2)(b), and criminal sexual conduct in the second degree (CSC-II), MCL 750.520(c)(1)(b).[1] The trial court sentenced defendant as a habitual offender (second offense), MCL 769.10, to concurrent prison terms of 25 to 50 years for the CSC-I conviction and 107 months to 270 months for the CSC-II conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

### A. CONDUCT UNDERLYING THE OFFENSES

Approximately nine years before trial, defendant met (and later married) Rachel B., a widow and mother of four children—JP, an older brother AP, and two younger brothers. Defendant and Rachel had a son together. In 2016, the family moved from Cincinnati, Ohio to Bessemer, Michigan.

---

[1] Defendant was also convicted of a second count of CSC-I; however, the prosecution moved the trial court to vacate that conviction, stating that it had discovered that the victim had been over the age of 13 at the time of the conduct underlying that conviction. The trial court granted the motion and dismissed the second count of CSC-I.

-1-

Multiple family members, including Rachel herself, testified that Rachel suffered from severe mental health issues that had resulted in several police contacts and hospitalizations in the past. These mental health issues often left Rachel unable to even speak coherently or move, much less care for the children.

In 2021, JP disclosed that defendant had sexually abused her since at least 2017. JP testified that defendant would make her perform sex acts in return for gifts that defendant had already given her in order to "repay" him for the gift. She testified that in February 2017, defendant made JP (then aged 12) give him a "hand job" in return for a phone charger that defendant had given her to replace her broken charger. In 2018, defendant forced JP to perform oral sex on him in order to "earn" a new cellular phone. On another occasion in 2018, defendant came into JP's bedroom while she was sleeping and began licking her genital area. JP also testified that defendant forced her to give him another hand job in July 2018 in return for a ukulele defendant had given her, and another in October 2018 in return for a Halloween costume defendant had purchased for her. JP testified that defendant told her that she "can't expect anything from like [sic] a man without putting out. He said nothing in life is free."

In 2019, defendant was arrested and charged with domestic violence. The children were removed from defendant's and Rachel's care and placed in foster care during a Children's Protective Services (CPS) investigation. The children were returned to defendant's and Rachel's care in 2018, and the charges against defendant were ultimately dropped.

In 2021, JP disclosed defendant's sexual abuse to a friend at high school, and subsequently to school personnel and law enforcement. Defendant was arrested and charged with two counts of CSC-I and one count of CSC-II. The CSC-I counts were based on the incidents in which defendant forced JP to perform oral sex on him, and when he licked her genital area. The CSC-II count was based on defendant forcing JP to touch his penis sexually. An element of the CSC-I charges was that JP was under the age of thirteen at the time of the offense, while the CSC-II charge required proof that JP was at least thirteen and less than fifteen years of age and a member of the same household as defendant.

## B. JAIL PHONE CALLS

During the day following his arrest, defendant made numerous phone calls from jail, primarily to his mother, Lois C., but also to AP. Twelve of these calls were played for the jury. During these calls, defendant generally would insist that JP had fabricated the accusations against him, and stated that if JP didn't recant her story, he would die in prison. He repeatedly requested that his mother and AP talk to JP and get her to recant. He also emphasized his role in caring for Rachel and the other, younger children, repeatedly implying or stating that they would die or suffer greatly without him. During one call, defendant was placed on a speakerphone and spoke directly to JP, accusing her of lying, telling her that her mother and brothers would suffer without his care, and offering to allow JP to be emancipated and move out of the family home. During that call, the following exchange occurred between Lois and JP:

LOIS: Yeah, right, okay, come up with some other crap. I want you to take a lie detector test. [Indecipherable].

JP: Okay. Okay, set it up and I will take one. You think I'm lying? Why would I make this up? Why would I put myself through this? Why would I put my own brothers through this? You think I wanted this? You think I wanted this life for me? Why would I lie about this? Why would I tear our family apart?

Defendant and Lois also berated JP and accused her of lying on another phone call the next day. Defendant accused JP of "taking [him] away" from her siblings and mother, and offered to let JP live with her friend if she would "get [him] out of here."

## C. MOTIONS IN LIMINE

### 1. EXPERT WITNESS

Before trial, the prosecution moved the trial court in limine to admit the curriculum vitae (CV) and testimony of Gloria Gillespie, M.A. as an expert witness in the field of sexual abuse. Defendant filed a competing motion in limine, arguing that the prosecution's motion was untimely and requesting that the trial court either exclude Gillespie's testimony or "in the alternative limit her testimony to speak only about the fact that delayed reporting is common in sexual abuse case [sic]."

A hearing was held on the competing motions. At the hearing, Gillespie testified that she owned a private counseling practice with a specialty in dealing with sexual abuse victims and offenders. She testified that she had been working with sexual abuse victims and offenders since 1976, and had been qualified as an expert in the field of sexual abuse between fifty and one hundred times, including in May and July of 2021. She had not published any work since 1986. She testified that she had a master's degree and underwent continuing education every year to maintain her contract with the state. She testified that she had helped develop the forensic interview protocol in Michigan, which is used when interviewing children who have reported sexual abuse. She was appointed by several governors to the Child Abuse Task Force.

Gillespie testified that she understood that she would be testifying about typical behavior in child sexual abuse victims in the areas of delayed disclosure, manner of initial disclosure, and continued contact with the abuser, as well as offering her expert opinion about whether sexual abuse is usually committed by strangers and about false reporting of sexual abuse by children. Gillespie testified that she had testified in these areas before, and that her opinions were based on her years of experience working in the field. She admitted that she could not provide a particular study or studies in support of her opinions. Gillespie testified that she was aware that she could not comment on JP's credibility.

The trial court held that Gillespie was qualified as an expert in the field of sexual abuse and admitted her CV into evidence. The court therefore granted the prosecution's motion in limine, and denied defendant's motion in limine.

### 2. RECORDINGS OF JAIL PHONE CALLS

The prosecution also moved the trial court to admit the recordings of the calls defendant had made from jail, arguing that these calls showed that defendant "planned to coerce the victim into changing her version of events through conversations" defendant had with Lois, AP, and JP

herself. At the motion hearing, defendant objected to the admission of the calls as irrelevant and prejudicial, but stipulated that the calls were authentic and that the foundation for their admission had been established. The trial court indicated that it would review the calls before ruling on the motion. The trial court subsequently issued an order granting the prosecution's motion and admitting the calls into evidence, holding that the recordings were relevant under MRE 401.

## D. TRIAL

A four-day trial was held from August 10 to August 13, 2021. On day two of the trial, during JP's testimony, the prosecution played the recordings of the two phone calls defendant had made from jail in which he spoke directly to JP. Detective-Sergeant Jorge Cruz of the Gogebic County Sheriff's Office testified regarding his interview with JP at her school and the arrest and interview of defendant. The prosecution asked Detective-Sergeant Cruz about defendant's calls from jail, and played the recordings of five conversations between defendant and Lois. Day two of the trial then ended.

When Detective-Sergeant Cruz's testimony resumed on day three, the prosecution played seven recordings of phone calls defendant had made from jail, which consisted of five recordings that had not been played as well as the two recordings in which defendant addressed JP directly (which had been played the previous day). Defendant objected to the recordings being replayed from the previous day; the trial court overruled the objection. Following the playing of the call in which Lois told JP that she wanted her to take a lie detector test, the following colloquy occurred between the prosecution and Detective-Sergeant Cruz:

> *Q*. Okay, I'm going to pause it right there because I believe you just heard [JP] mention a lie detector test.
>
> *A*. Well, I believe I heard Lois mention it and [JP] agreed to take one.
>
> *Q*. Okay. In cases of sexual abuse with children, is it your policy to offer lie detector tests?
>
> *A*. No. And it's not just with children, it's sexual assault victims. A polygraph or a lie detector test, um, isn't asked for.
>
> *Q*. While we're on the subject of scientific evidence, if you will, is there any scientific evidence in this case?
>
> *A*. There is not.

After Detective-Sergeant Cruz testified, and outside the presence of the jury, defense counsel moved for a mistrial, arguing that the portion of the recording in which JP and Lois referred to a lie detector (polygraph) test was inadmissible and prejudicial, and that the prosecution had made matters worse by emphasizing that portion to the jury during her questioning of Detective-Sergeant Cruz. Defense counsel argued that a curative instruction would not resolve the error and, if the trial court denied a mistrial, such an instruction would not be requested. The court denied defendant's motion for a mistrial, but ordered that the recording and transcript of the recording be edited to strike the statements concerning a polygraph test.

Gillespie testified on the third day of trial. She testified to her qualifications as a counselor working in the field of sexual abuse. She testified that she had never met with JP, and that her testimony was not specific to JP or the case against defendant. Gillespie testified that it was common for child victims of sexual abuse to delay reporting the abuse, and she provided examples of reasons why child victims might delay reporting abuse, including that the children might have a relationship with the abuser, might feel that the abuse was their fault, might fear that they won't be believed or that the family will break up if they disclose the abuse, or that other family members might be mad at them. Gillespie also testified that the delay in disclosure can be years long, citing an example of a patient who did not disclose her childhood sexual abuse until she was over fifty years old. Gillespie testified that child sexual abuse victims typically first disclose to a peer. She also testified that most persons who are sexually assaulted, whether as children or adults, are assaulted by someone they know rather than a complete stranger. She also testified that many victims of child sexual abuse continue to have a relationship with their abuser, especially if they are living with the offender. Defense counsel did not cross-examine Gillespie.

Defendant testified and denied JP's allegations. The jury found defendant guilty of two counts of CSC-I and one count of CSC-II.

## E. SENTENCING

As stated, prior to defendant's sentencing, the prosecution moved to dismiss the count of CSC-I based on defendant's oral contact with JP genitals, and the trial court granted that motion. The trial court sentenced defendant as described.

On August 5, 2022, defendant moved the trial court for resentencing, arguing for the first time that a CSC-I conviction did not require a mandatory minimum sentence of 25 years, and that language in published cases interpreting MCL 750.520b as requiring such a mandatory minimum sentence was dicta and should not be followed. After a hearing, the trial court denied defendant's motion, holding that clear and binding precedent from the Michigan Supreme Court and this Court states that a CSC-I conviction carries a mandatory minimum sentence of 25 years.

This appeal followed.

## II. EXPERT WITNESS TESTIMONY

Defendant argues that the trial court erred by qualifying Gillespie as an expert and admitting her testimony. We disagree. We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). We also review for an abuse of discretion a trial court's decision to qualify a witness as an expert. *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007). A trial court abuses its discretion when its decision results in an outcome outside the range of reasonable and principled outcomes. *Id.*

MRE 702 governs the admissibility of expert testimony, and provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Admissibility under this rule requires that the evidence comply with a three-part test. First, the expert himself must be qualified. Second, the evidence must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue. Finally, the evidence must be from a recognized discipline." *People v Beckley*, 434 Mich 691, 711; 456 N2d 391 (1990).

In this case, defendant challenges the trial court's qualification of Gillespie as an expert as well as the scientific validity of her testimony under MRE 702. Regarding Gillespie's qualification, defendant argues that Gillespie's lack of authored publications and her statements that she could not cite published sources in support of her opinions indicated that she lacked sufficient knowledge to be qualified as an expert in the area of sexual abuse. We disagree. Gillespie's testimony was offered to explain the typical behaviors of sexually abused children concerning their disclosure of the abuse, particularly a delay in disclosure. Our Supreme Court has held that an expert with the "appropriate educational background as well as extensive firsthand experience with sexually abused children," including specifically a licensed counselor with a practice that specializes in sexual abuse, may be qualified as an expert on child sexual abuse. *Beckley*, 434 Mich at 712. Gillespie's lack of published material, or the fact that she did not cite published scientific studies that supported her opinions, did not require that the trial court deny her qualification as an expert. MRE 702 explicitly permits the qualification of an expert based on knowledge and experience. Gillespie testified to significant knowledge and experience regarding the behaviors of sexually abused children. She testified that she had operated a counseling practice since 1980 that specialized in the treatment of sexual abuse victims and offenders, had over 40 years of experience with child sexual abuse victims, had provided services to over 4,000 child sexual abuse victims, and had taught courses and led seminars on the subject matter of child sexual abuse. Gillespie had a master's degree in counseling, was licensed by the state of Michigan, regularly attended continuing education classes on various subjects, and had been qualified as an expert in the area of child sexual abuse by Michigan courts numerous times in the past. The trial court did not abuse its discretion by qualifying Gillespie as an expert. *Dobek*, 274 Mich App at 93.

Defendant also argues that Gillespie's testimony was not sufficiently scientifically reliable under *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 278; 125 LEd2d 469 (1993), and therefore should not have been admitted under MRE 702. We disagree.

MRE 702 requires that the trial court act as a "gatekeeper" and admit evidence "only once it ensures, pursuant to MRE 702, that expert testimony meets [MRE 702's] standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). A proponent of an expert opinion must show that at the opinion rests on data "viewed as legitimate in the context of a particular area of expertise" and further that "any opinion based on those data expresses conclusions reached through reliable principles and methodology." *Id*. Specific to CSC trials, "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995).

Defendant spends a great deal of time in his brief discussing the scientific reliability, or lack thereof, of the theory of Child Sexual Abuse Accommodation Syndrome (CSAAS) as promulgated by Dr. Roland Summit. But Gillespie never testified that CSAAS formed the basis for her opinions or mentioned CSAAS at all; nor did any other witness mention CSAAS. In any event, whether based explicitly on Summit's CSAAS, another similar theory, or merely her own experience, Gillespie's testimony primarily concerned the "typical" behaviors of child sexual abuse victims regarding delayed disclosure and possible reasons for those behaviors. Such testimony has explicitly been found reliable under MRE 702. See *Peterson*, 450 Mich 349, 373; 537 NW2d 857 (1995) ("We hold that the prosecution may present evidence, if relevant and helpful, to generally explain the common postincident behavior of children who are victims of sexual abuse. The prosecution may, in commenting on the evidence adduced at trial, argue the reasonable inferences drawn from the expert's testimony and compare the expert testimony to the facts of the case."). To the extent that Gillespie's unchallenged and brief testimony ranged beyond the issue of delayed disclosure, such as her statements that children are typically sexually abused by persons they know rather than strangers, such statements were made in the context of Gillespie's opinion regarding common post-abuse behavior in children—i.e., in describing how a child who was abused by a family member may act differently regarding disclosure than one who was abused by a stranger. *Id.* Gillespie's testimony did not improperly vouch for JP's credibility—in fact, her testimony did not touch on the issue of false reporting at all, despite defendant's attacks on JP's credibility. See *Thorpe*, 504 Mich at 251.

Further, Gillespie's testimony was based on a reliable scientific methodology, considering the field involved. Behavioral science such as counseling, and the subspecialty of child sexual abuse counseling, are recognized fields of expertise. See *Peterson*, 450 Mich at 363; *Beckley*, 434 Mich at 718. And our Supreme Court has noted that "there is a fundamental difference between techniques and procedures based on chemical, biological, or other physical sciences as contrasted with theories and assumptions that are based on the behavioral sciences." *Beckley*, 434 Mich at 719. The lack of the sort of definitive empirical data that one might expect in the "hard" sciences is irrelevant; the observational study of human behavior does not lend itself to the type of scientific testing that might be performed in the areas of physics or chemistry. *Id.* at 721. The opinion of a sufficiently qualified expert based on clinical observations of a class of victims can be found to be sufficiently reliable to satisfy MRE 702. *Id.* at 721; see also *In re Noecker*, 472 Mich 1, 12; 691 NW2d 440 (2005) (finding a psychiatrist's testimony regarding the typical behavior of alcoholics, based on his personal observation and experience, was admissible under MRE 702).

In sum, we hold that the trial court did not abuse its discretion by admitting Gillespie's testimony under MRE 702. Defendant's arguments concerning the alleged lack of data supporting Gillespie's testimony, the extent of her experience with child sexual abuse victims, and her unfamiliarity with other published studies in the area, went to the weight of her testimony, not its admissibility. See *Noecker*, 472 Mich at 12; *Beckley*, 434 Mich at 712-713; see also *People v Whitfield*, 425 Mich 116, 123-124; 388 NW2d 206 (1986). Defendant chose not to explore these issues through cross-examination. Defendant has not demonstrated that the trial court's admission of Gillespie's testimony was outside the range of reasonable and principled outcomes. *Dobek*, 274 Mich App at 93.

## III. ADMISSION OF JAIL CALLS

Defendant also argues that the trial court erred by admitting the recordings of defendant's jail calls *in toto*, because they were irrelevant and unfairly prejudicial. Relatedly, defendant also argues that the trial court erred by denying his motion for a mistrial based on the admission of the portion of the recording in which Lois and JP discussed a polygraph test. We disagree with both arguments.

## A. RELEVANCE AND PREJUDICE

We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *Thorpe*, 504 Mich at 251.

Relevant evidence is generally admissible. See MRE 402; *People v Starr*, 457 Mich 490, 497; 577 NW2d 673 (1998). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; see also *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012). A material fact is one that falls within the range of litigated matters in controversy. See *People v Sabin (After Remand)*, 463 Mich 43, 57; 614 NW2d 888 (2000). To be material, evidence must be of consequence to the action, but it need not relate to an element of the charged crime or claim, or an applicable defense. *People v Brooks*, 453 Mich 511, 518; 557 NW2d 106 (1996).

"Evidence that reflects a defendant's consciousness of guilt is relevant." *People v Parrott*, 335 Mich App 648, 678; 968 NW2dd 548 (2021). A defendant's demeanor and statements during or after arrest can indicate consciousness of guilt. See, e.g., *People v Solmonson*, 261 Mich App 657; 683 NW2d 761 (2004). Evidence that a defendant made efforts to influence or intimidate a witness can show consciousness of guilt. *People v Dixon-Bey*, 321 Mich App 490, 514; 909 NW2d 458 (2017); see also *People Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010).

In this case, defendant's statements made during his recorded phone calls from jail, both directly to JP and to other members of his family, were part of a concerted effort to influence or intimidate JP into recanting her allegations of sexual abuse. They were therefore highly probative of defendant's consciousness of guilt.

Moreover, defendant's statements were not inadmissible under MRE 403. MRE 403 provides that otherwise relevant and admissible evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." MRE 403; see also *People v Feezel*, 486 Mich 184, 198; 783 NW2d 67 (2010). Unfairly prejudicial evidence is more than evidence that is damaging to a defendant's case. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995). Any relevant evidence will be damaging to a party's case to some extent; unfair prejudice exists when there is a risk that minimally probative evidence will be given undue or preemptive weight by the jury, *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008), or when the evidence is such that it might "stir the jurors to such passion that they would be swept beyond rational consideration of the defendant's guilt or innocence." *People v Starr*, 457 Mich 490, 503; 577 NW2d 673 (1998).

In this case, the evidence was highly probative of defendant's consciousness of guilt. Further, defendant has not demonstrated that his statements were at risk of being given "undue or preemptive weight by the jury," especially in light of JP's clear and consistent testimony. *Blackston*, 481 Mich at 462. Moreover, the evidence was not of the type that would inflame the jury beyond rational consideration of defendant's guilt or innocence. *Starr*, 457 Mich at 503. Some portions of the phone calls could at least arguably be viewed as helpful to defendant's case, such as his statements expressing concern for the other members of the family and reminding them of necessary obligations such as administering Rachel's medication. And defendant repeatedly denied JP's allegations during the calls. Considered especially in the light of JP's clear and consistent testimony, the trial court did not abuse its discretion by admitting the challenged evidence as relevant and not unfairly prejudicial. *Thorpe*, 504 Mich at 251.

## B. DENIAL OF MOTION FOR MISTRIAL

Defendant also argues that the trial court erred by denying his motion for a mistrial based on the admission of the recording that included Lois's and JP's statements about a polygraph test, and the prosecution's related questioning of Detective-Sergeant Cruz. We disagree. We review for an abuse of discretion a trial court's decision to grant or deny a mistrial. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995).

"A mistrial should only be granted for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Id.* (citations omitted). "Normally, reference to a polygraph test is not admissible before a jury." *People v Nash*, 244 Mich App 93, 97; 625 NW2d 87 (2000). We agree with defendant that the admission of the reference to a polygraph was error.[2] However, a reference to a polygraph test, while inadmissible, does not always constitute an error requiring reversal. *Id.* at 98, citing *People v Rocha*, 110 Mich App 1, 8; 312 NW2d 657 (1981). A brief, inadvertent, and isolated reference may not require reversal. *Id.* at 98, citing *Rocha*, 110 Mich App at 8. To determine whether reversal is required, a reviewing court should consider a number of factors, including

> (1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the fact that a test

---

[2] Although the prosecution briefly argues that the admission of the reference to a polygraph examination was "benign" because there was no reference to an actual polygraph test being taken or the results of that test, the case law on this issue overwhelmingly indicates that even fleeting references to polygraph examinations are, at a minimum, inadmissible as irrelevant, even if non-prejudicial. See, e.g., *People v McGhee*, 268 Mich App 600, 631; 709 NW2d 595 (2005) (describing a brief reference to a witnesses agreement to submit to a polygraph examination, even though no evidence was presented that an examination had actually been performed, as an "improper reference to a polygraph test" and stating that it is "plain error to present to a jury a reference to taking a polygraph test").

had been conducted. [*Id.* at 98 (citations omitted), see also *People v Whitfield*, 58 Mich App 585; 228 NW2d 475 (1975).]

In this case, defense counsel did not make a contemporaneous objection when the inappropriate reference to a polygraph occurred. However, defense counsel did raise the issue before the trial court the following day and, while it declined to grant a mistrial, the trial court did order that the challenged statements be stricken from the record and associated transcript; it also offered a curative instruction, which defense counsel declined. This factor weighs in favor of defendant. See *Nash*, 244 Mich App at 98-99. Moreover, considering that the recording was played twice, and the prosecution made reference to the recording in questioning Detective-Sergeant Cruz, it cannot be said that the reference was inadvertent; the reference also was repeated, albeit only a few times. Therefore, the first three factors somewhat favor defendant. See *id.*

There is no evidence that the reference was an attempt to bolster JP's credibility. The issue of a polygraph test was raised by Lois in the context of a heated argument; JP responded that she would be willing to take such a test. In context, this exchange looks more like an argument over JP's truthfulness than a genuine plan for JP to take a polygraph test in the future. In any event, Detective-Sergeant Cruz, the only state actor who testified about polygraph tests, limited his testimony to the simple assertion that polygraph tests were not requested in sexual abuse cases and that this case in particular had no "scientific evidence" available. This factor favors the prosecution.

The most critical factor in this case is the fifth factor. In this case, not only were polygraph *results* not admitted, but there was no mention of a polygraph test even having been taken, such that even the "mere fact that a test had been conducted" was not admitted. See *Nash*, 244 Mich App at 98. In fact, Detective-Sergeant Cruz testified that it was police policy not to request polygraph examinations in cases such as this, and he stated that no scientific evidence existed in this case. Unlike in *Nash*, where the witness's reference to having taken a polygraph test supported the inference that she had passed that test, in this case any inference that JP had taken a polygraph test and passed would have to have been made by the jury not merely in the absence of evidence, but in the face of contradictory evidence. See *id*. at 93.

Considering the totality of the circumstances surrounding the reference to a polygraph examination in this case, we conclude that there was not a reasonable possibility that the jury relied on this reference to resolve the credibility dispute between JB and defendant. See *id*. at 101, citing *People v Yatooma*, 85 Mich App 236, 241; 271 NW2d 184 (1978). That conclusion, along with the steps taken by the trial court and the parties to avoid further references to a polygraph examination, supports our holding that the trial court did not abuse its discretion by denying defendant's motion for a mistrial. *Haywood*, 209 Mich App at 228.

## IV. PROSECUTORIAL MISCONDUCT

Defendant also argues that the prosecution committed prosecutorial misconduct[3] in its closing argument. We disagree. Defendant did not object to the prosecution's statements at the time they were made; accordingly, we review this unpreserved issue for plain error affecting substantial rights. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). An unpreserved claim of prosecutorial misconduct will not warrant relief unless the prejudicial effect was so great that it could not have been cured by an appropriate instruction. *People v Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994).

The prosecution may use its closing argument to argue the evidence and all reasonable inferences arising from that evidence as it relates to the prosecution's theory of the case. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). However, the prosecution may not argue facts that are unsupported by the evidence. *Stanaway*, 446 Mich at 686; *People v Unger*, 278 Mich App 210, 241; 749 NW2d 272 (2008).

Defendant argues that the following statements from the prosecution constituted misconduct:

> [JP] testified that her mother had mental health problems, that she worked with CMH [Community Mental Health], she took a bunch of medicine, and that she had been hospitalized several times. She described her, at different points in time, she wasn't doing well, as zombie-like, lifeless, just there, slept all the time, drank alcohol, would just sit at the kitchen table, could not take care of us [sic]. It got to the point where she didn't even talk. But she also pointed out an interesting phenomenon. That when [defendant] wasn't around her that Rachel seemed to be better, back in 2019 and now. When she was better, she talked better. She did more on her own. She could cook. She brought arts and crafts to visits, and she looked happy, and she even helped Jocelyn clean her infamous room.

Defendant argues that these statements were not supported by the evidence, and that the "fair implication of the prosecutor's closing argument was that the Defendant was drugging [Rachel]." We disagree with both assertions. The record shows that JB testified that Rachel was doing better in 2019 when she was living apart from defendant, and that AP and Rachel herself testified that she was doing better at the time of trial. The prosecution also accurately summarized JB's testimony regarding what her mother was like when she was not doing well. Defendant's argument that these statements were not based in evidence lacks merit. *Stanaway*, 446 Mich at 686.

---

[3] This Court has stated that the term "prosecutorial misconduct" should properly be applied to conduct that is illegal, fraudulent, or in violation of the rules of professional conduct, rather than technical or inadvertent mistakes. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Because defendant argues that the prosecution deliberately misrepresented the evidence presented at trial in order to induce the jury to believe that defendant was drugging his wife, and that the prosecution did so in an effort to impermissibly influence the jury verdict, we conclude that defendant's claim is appropriately referred to as one of prosecutorial misconduct.

More importantly, we disagree with the assertion that the "fair implication" of the prosecution's statements was that defendant was drugging his wife. Simply put, no one said that, or even implied it. Defendant does not explain how or why the jury would make such a large inferential leap based on the prosecution's statements. The "fair implication" of the prosecution's statements is simply that Rachel seemed to be better off without defendant; in the context of defense counsel's presentation of defendant as a devoted family man who took care of his mentally-ill wife, these statements were not impermissible. See *United States v Young*, 470 US 1, 11-13; 105 S Ct 1038; 84 L Ed 2d 1 (1985) (stating that courts must weigh the prosecution's remarks against the defense's, and, if the prosecution's remarks did no more than respond to right the scale, the comments will not warrant reversal); *People v Brown*, 279 Mich App 116, 135-136; 755 NW2d 664 (2008). Moreover, the jury was instructed that the statements of attorneys were not evidence, and there was no evidence that they failed to follow this instruction. *Solmonson*, 261 Mich App at 657 ("[J]urors are presumed to follow the trial court's instructions."). Defendant has not established error, plain or otherwise, in the prosecution's statements. We therefore reject his claim of prosecutorial misconduct, as well as his claim in the alternative that his counsel was ineffective for failing to object to these statements. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## V. DENIAL OF RESENTENCING

Defendant argues that the trial court erred by denying his motion for resentencing and holding that the language of MCL 750.520b(2)(b) required it to impose a mandatory 25-year minimum sentence for defendant's CSC-I conviction.[4] We review de novo issues of statutory interpretation. *People v Gubachy*, 272 Mich App 706, 708; 728 NW2d 891 (2006).

The same or very similar arguments defendant makes concerning the construction of MCL 750.520b(2)(b) were considered, and rejected, by this Court earlier this year in *People v Roy*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 359894). This Court in *Roy* noted that "[o]ur Supreme Court and this Court have consistently explained that MCL 750.520b(2)(b)'s 25-year provision imposes a mandatory *minimum* sentence." *Id.*, slip op at 4. The panel held that "pursuant to MCL 750.520b(2)(b), a person who is 17 years old or older who is convicted of a CSC-I offense against a victim or victims under the age of 13 who receives a term-of-years sentence must be sentenced to a term of not less than a 25-year minimum sentence." *Id.*, slip op at 7.

---

[4] Defendant argues that the statutory 25-year term applies to a defendant's *maximum* sentence, not the minimum sentence.

This Court is bound to follow *Roy*.[5]  MCR 7.215(J)(1).  We therefore find no error in the trial court's denial of defendant's motion for resentencing.

Affirmed.


/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle

---

[5] We note that our Supreme Court denied the defendant's application for leave to appeal in *Roy*. See *People v Roy*, ___ Mich ___; 994 NW2d 265 (2023).